[No. C003474. Third Dist. May 23, 1990.]

ROBERT STEWART HOWARD et al., Plaintiffs and Appellants, v. COUNTY OF AMADOR et al., Defendants and Appellants.

964

COUNSEL

Diepenbrock, Wulff, Plant & Hannegan, Forrest A. Plant and Brian T. Regan for Plaintiffs and Appellants.

John F. Hahn, County Counsel, for Defendants and Appellants.

OPINION

**SPARKS, J.**—This is an appeal and cross-appeal from a judgment entered on plaintiffs' complaint for a refund of property taxes. Plaintiffs are a number of individuals and trustees who obtained their title to the property through the late Charles S. Howard.[1] The defendant is the County of Amador (County).

The dispute in this case involves the meaning of the term "change of ownership" as used in article XIII A, of the California Constitution (Proposition 13), and implementing legislation, when applied to real property subject to fixed long-term mineral leases. The trial court entered judgment in favor of plaintiffs, but in which it only partially agreed with their contentions. Both sides to the litigation object to the trial court's determination and have appealed. A summary statement of the contentions on appeal would make little sense without a factual predicate. It will suffice at this point to state that we agree with the trial court and shall affirm the judgment.

FACTUAL BACKGROUND

In 1942 plaintiffs' predecessor in interest, the Charles S. Howard Company, acquired title to 33,000 acres of land in Sacramento and Amador Counties. The property is referred to as the Grant. Approximately 19,800 acres of the Grant are located in Amador County. The property contains nonmetallic minerals such as clays, sands, and lignite.[2] In 1948 the Charles S. Howard Company leased to Gladding McBean & Co. the exclusive right to mine and remove clays, sands, earth and other nonmetallic minerals from the property. The lease was for a period of 30 years and was to expire in

---

[1] For convenience, and due to a unity of interest, the parties and the trial court referred to the plaintiffs' interests in the singular as the "Howard" interest, a useful practice to which we will adhere.

[2] Lignite is a brownish-black coal intermediate between peat and bituminous coal, and in which the texture of the original wood is distinct. It is sometimes called brown coal or wood coal. (Webster's New Internat. Dict. (3d ed. 1971) p. 1309.)

1978. The Howard Company retained the right to extract lignite, oil, and gas and other petroleum products, and to use the Grant for stock raising and other surface purposes. Plaintiffs succeeded to the interest of the Charles S. Howard Company after the death of Charles S. Howard.

Over the years the parties amended the lease on a number of occasions. In the second amendment, in 1952, Gladding McBean was given permission to sublease the right to mine and extract crude sand on a 1,700-acre portion of the property to Owens-Illinois Glass Company. The amendment provided that Gladding McBean was to pay to Howard all royalties payable to it by Owens-Illinois under the terms of the sublease. It was further provided that in the event of termination of the original lease by default of Gladding McBean, the rights of Owens-Illinois under the sublease would not be affected; instead, Howard would be substituted for Gladding McBean as lessor. The second amendment extended the term of the original lease to the year 2050. Gladding McBean then entered into a sublease with Owens-Illinois with a term to the year 2050.

Eventually Gladding McBean and other entities formed a new corporation which ultimately became known as Interpace. In 1962, in a sixth amendment to the original lease, Interpace was substituted for Gladding McBean as lessee. Interpace succeeded to all rights and duties of Gladding McBean, including the rights and duties established by the Owens-Illinois sublease.

In 1965 Howard leased to American Lignite Products Company (ALPCO), the right to extract lignite from a portion of the property. ALPCO assigned its lignite lease to Interpace. In 1969 Howard and Interpace agreed to a seventh amendment to the original lease. In that amendment the Howard-ALPCO lignite lease was cancelled and Howard granted to Interpace the right to extract lignite from all of the property.

By 1977 a dispute had arisen between Interpace and Howard. Interpace wished to transfer its lignite rights to ALPCO, but Howard refused to consent to the transfer. Interpace filed a suit for declaratory and injunctive relief, seeking to compel Howard to consent to the transfer of the lignite rights to ALPCO. Howard filed a cross-complaint for fraud, negligent misrepresentation, breach of lease, ejectment, rescission, and declaratory relief. The parties did not prosecute their litigation to judgment. Instead, in 1981, they settled their dispute by entering into a 12th amendment to the lease. This 12th amendment is the first transaction at issue in this lawsuit. The County maintains that the 12th amendment constitutes a change of ownership within the meaning of Proposition 13 (Cal. Const., art. XIII A, § 2, subd. (a)), so that the property may be reappraised to its full cash value as

of the date of the 12th amendment. The trial court concluded that the 12th amendment constituted a change of ownership of only the lignite rights. It reasoned that the surrender of the lignite rights was severable from the balance of the 12th amendment and hence resulted in a change of ownership as to those rights only.

In September 1981, about seven months after the 12th amendment, Interpace assigned its rights under the lease to Eltra Corporation, a wholly owned subsidiary of Allied Corporation. Allied operates the lease under the corporate name NARCO. The County maintains, and the trial court agreed, that the Interpace-NARCO assignment constituted a change of ownership.

The final transaction in dispute between the parties involves the Owens-Illinois sublease. Throughout the relevant period Owens-Illinois has continued to operate under its sublease. The County maintains that the Owens-Illinois sublease has undergone a change of ownership by virtue of the 12th amendment and the Interpace-NARCO assignment. The trial court rejected that claim and held that no change of ownership occurred with respect to the sublease.

Both sides to the litigation have appealed. In its appeal the County contends that the 12th amendment was a change of ownership which requires revaluation of all real property interests in the grant, that the Interpace-NARCO assignment constituted a change of ownership of the Owens-Illinois sublease as well as the other interests, and that the trial court failed to apply the substantial evidence rule to the County Board of Equalization's administrative findings. The plaintiffs contend that the 12th amendment did not constitute a change of ownership of the lignite rights and that the Interpace-NARCO assignment was not a change of ownership.

## Discussion

### I

In 1978 the voters approved Proposition 13, which added article XIII A to the state Constitution. Article XIII A converts our property tax system from a current value method to an acquisition value system. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 236 [149 Cal.Rptr. 239, 583 P.2d 1281].) Essentially, property is assessed at its full cash value when it is acquired and thereafter may not be reassessed, except that property values may be adjusted to reflect an inflationary rate not to exceed 2 percent per year. (Cal. Const., art. XIII A, § 2, subds. (a), (b).) For purposes of implementation of article XIII A,

property which had been acquired prior to 1975 was treated as though it was acquired in 1975 and assessed values were "rolled back" to the 1975-1976 valuations. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at p. 236.) Property may be reassessed to its current full cash value "when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment." (Cal. Const., art. XIII A, § 2, subd. (a).)

In *Amador Valley, supra,* the Supreme Court recognized that article XIII A is imprecise and ambiguous in a number of particulars. The court nevertheless concluded that the measure could be implemented through normal principles of judicial construction and, most importantly, by contemporaneous construction by the Legislature and administrative agencies charged with implementation. (22 Cal.3d at p. 245.) In fact, after the adoption of article XIII A, the Assembly Committee on Revenue and Taxation formed a task force to recommend implementing legislation and ultimately certain measures were adopted for that purpose. In particular, certain provisions were added to the Revenue and Taxation Code to define "change of ownership" as that term is used in article XIII A. (See Rev. & Tax. Code, § 60 et seq. [unless otherwise specified, further section references are to the Revenue and Taxation Code].)

Section 60 provides: "A 'change in ownership' means a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." Section 61 provides: "Except as otherwise provided in Section 62, change in ownership, as defined in Section 60, includes, but is not limited to: . . ." There follow various examples of a change of ownership. Relevant here is subdivision (a), which, as originally enacted and in effect at the time this dispute arose, provided that a change of ownership includes: "The creation, renewal, sublease, assignment, or other transfer of the right to produce or extract oil, gas, or other minerals for so long as they can be produced or extracted in paying quantities. The balance of the property, other than the mineral rights, shall not be reappraised pursuant to this section." (Stats. 1979, ch. 242, § 4, pp. 507-508.) In 1985 subdivision (a) of section 61 was amended to read: "The creation, renewal, sublease, assignment, or other transfer of the right to produce or extract oil, gas, or other minerals regardless of the period during which the right may be exercised. The balance of the property, other than the mineral rights, shall not be reappraised pursuant to this section." (Stats. 1985, ch. 186, § 3, p. 1131.)

At all relevant times section 61, subdivision (c) has provided that a change of ownership includes, among other things: "(1) The creation of a leasehold interest in taxable real property for a term of 35 years or more

(including renewal options), the termination of a leasehold interest in taxable real property which had an original term of 35 years or more (including renewal options), and any transfer of a leasehold interest having a remaining term of 35 years or more (including renewal options); or (2) any transfer of a lessor's interest in taxable real property subject to a lease with a remaining term (including renewal options) of less than 35 years. [¶] Only that portion of a property subject to such lease or transfer shall be considered to have undergone a change of ownership."

In this case we are confronted with a situation of divided ownership of interests in real property. The Howard interests retain all rights in the property, including surface uses, which have not been granted to others in mineral leases. The mineral leases give the lessees the exclusive rights to mine and extract certain minerals from the property until the year 2050. The dispute between the parties arises in part because the list of examples of a change of ownership set forth in section 61 is not comprehensive. Until its amendment in 1985, section 61, subdivision (a), referred to mineral leases for so long as minerals can be produced or extracted in paying quantities. ■ The County points out that the leases involved here are for a specific term of years, and thus the County asserts that the situation is not governed by subdivision (a). Rather, according to the County, the situation falls within subdivision (c), which deals with long-term leases. According to the County the purpose of subdivision (c) is to identify the "primary owner" of real property and to require that upon a transfer of the interest of the primary owner all of the separate property interests in the property be revalued for taxation purposes. Thus, according to the County, upon a transfer of Interpace's mineral lease all of the interests in the property, including Howard's fee interest and Owens-Illinois's sand lease, must be reassessed at current value. We find this argument unconvincing.

Real property exists both physically and temporally. The most basic form of ownership, fee simple, entitles the owner to exclusive enjoyment of the property in perpetuity, that is, for so long as the property exists. (Civ. Code, §§ 691, 762.)[3] A fee simple interest is an estate of inheritance. (Civ. Code, §§ 761-762.) The enjoyment of a parcel of property may be subject to division in a variety of ways. It may, of course, be physically divided through subdivision. And the enjoyment of property may be divided temporally through the creation of an estate for life, an estate for years, or an estate at will. (Civ. Code, § 761.) Fee interests and life estates are considered to be freehold estates; estates for years are deemed to be chattels real;

---

[3] A fee simple may be absolute or may be terminable upon the occurrence of a condition subsequent. (Civ. Code, §§ 762, 885.010 et seq.) In either case the property interest is considered perpetual. (Civ. Code, §§ 761, 762.)

estates at will are chattel interests, but are not subject to enforcement of a money judgment. (Civ. Code, § 765.)

In this case we are not arguably concerned with issues relating to life estates or estates at will and we need not further refer to those estates. But the County's argument does implicate an estate for years. ■ The term "estate for years" is another name for a leasehold estate. (*Parker* v. *Superior Court* (1970) 9 Cal.App.3d 397, 400 [88 Cal.Rptr. 352, 67 A.L.R.3d 743].) The distinguishing characteristics of a leasehold estate are that the lease gives the lessee the exclusive possession of the premises against all the world, including the owner (*Von Goerlitz* v. *Turner* (1944) 65 Cal.App.2d 425, 429 [150 P.2d 278]), and its term is limited to endure for a definite and ascertained period, however short or long the period may be. (*Guy* v. *Brennan* (1923) 60 Cal.App. 452, 456 [213 P. 265].)

Another way in which the enjoyment of property may be divided is through the creation of a subsurface interest, such as a mineral interest. ■ A mineral lease does not give the holder the exclusive right to possession and enjoyment of the property. Instead, it gives the holder the right to extract minerals from the property and to reduce them to personal property. All other rights in the land, including surface uses, are retained by the landowner. (See *Graciosa Oil Co.* v. *Santa Barbara* (1909) 155 Cal. 140, 144-146 [99 P. 483].) ■ ■ ■ ■ ■ Regardless of the term of a mineral lease, the interest created is a *profit à prendre*, which is an incorporeal hereditament. (*Atlantic Oil Co.* v. *County of Los Angeles* (1968) 69 Cal.2d 585, 594 [72 Cal.Rptr. 886, 446 P.2d 1006]; *Callahan* v. *Martin* (1935) 3 Cal.2d 110, 118 [43 P.2d 788, 101 A.L.R. 871].)[4] ■ An incorporeal hereditament is an inheritable right stemming from corporeal property but which is not itself corporeal. (*Gerhard* v. *Stephens* (1968) 68 Cal.2d 864, 878, fn. 7 [69 Cal.Rptr. 612, 442 P.2d 692]; *Lynch* v. *State Bd. of Equalization, supra*, 164 Cal.App.3d at p. 102, fn. 4.)

Before Proposition 13, when California operated under a current value method of property taxation, it was unnecessary to develop special rules for the treatment of property subject to temporal division, such as by an estate for years. In such cases one party, such as a lessee, would have the exclusive right to possession and enjoyment of the property for a period of time and

---

[4] Many of the precedential opinions we will cite in our discussion involve oil and gas producing properties. Oil and gas are considered "fugacious minerals" since, due to their fluid nature, they can migrate within the earth. (*Lynch* v. *State Bd. of Equalization* (1985) 164 Cal.App.3d 94, 100 [210 Cal.Rptr. 335].) This aspect of oil and gas deposits makes them sui generis. (*Id.* at p. 98.) However, oil and gas rights are still considered to be *profits à prendre*, and in the context of this case there is no significant distinction between oil and gas leases and leases for the extraction of other minerals. (See *Callahan* v. *Martin, supra*, 3 Cal.2d at p. 120.)

another party, such as a lessor, would have a reversionary or a remainder interest, but the property was still assessed and taxed at its full current value. Thus the creation, termination, or transfer of a leasehold interest was not significant in the assessment of the property. This was not true with respect to mineral interests. The right to mine and extract minerals from real property may have a value to its holder far in excess of the value of the surface uses. (See *Lynch* v. *State Bd. of Equalization, supra,* 164 Cal.App.3d at pp. 103-104.) The taxable nature of such an interest has long been settled. ■ The conveyance of a mineral interest in land, it has been held, creates two separate estates in the land, each of which is subject to taxation and thus may be separately taxed. (*Bakersfield etc. Co.* v. *Kern County* (1904) 144 Cal. 148, 152 [77 P. 892]; *Red Bluff Developers* v. *County of Tehama* (1968) 258 Cal.App.2d 668, 672 [66 Cal.Rptr. 229].) If the mineral interest is for so long as minerals can be extracted in paying quantities, the interest is perpetual and is considered to be a fee interest, which is a freehold estate. (*Atlantic Oil Co.* v. *County of Los Angeles, supra,* 69 Cal.2d at p. 594; *Dabney-Johnston Oil Corp.* v. *Walden* (1935) 4 Cal.2d 637, 649 [52 P.2d 237]; *Callahan* v. *Martin, supra,* 3 Cal.2d at p. 120.) If the interest is for a term of years, it is considered to be a chattel real, but is nevertheless an estate in land which is subject to taxation separate from the remaining interests. (See *Atlantic Oil Co.* v. *County of Los Angeles, supra,* 69 Cal.2d at pp. 594-595; *Picchi* v. *Montgomery* (1968) 261 Cal.App.2d 246, 251-252 [67 Cal.Rptr. 880].)

Under the acquisition value method of taxation established by Proposition 13 there should be no special problems with respect to the creation, termination, or transfer of mineral rights as such. This is because the incorporeal hereditaments created by mineral leases have long been considered to be separate taxable estates and a change of ownership of such an estate is easily identified. This was not so with respect to the creation, termination, or transfer of an estate for years. When property is subject to an estate for years, two separate taxable estates do not exist; rather, the entire property is assessed and taxed but once.

In implementing Proposition 13 the Legislature recognized that when the period of an estate for years is sufficiently lengthy the creation, termination, or transfer of the leasehold becomes a virtual "change of ownership" of the property. This is in accordance with the basic definition of a change of ownership provided in section 60. That section creates a three-part test for determining when a change of ownership has occurred. First, there must be a transfer of a present interest in real property. Second, the interest must include the beneficial use of the property. Third, the value of the interest transferred must be substantially equivalent in value to the fee interest. A

leasehold estate transfers a present interest to the lessee which includes the beneficial use of the property. When its length is sufficiently long, the value of the leasehold becomes substantially equal to the value of the fee and thus a change of ownership will be recognized.

It could be asserted that the length of a lease which would have a value substantially equal to the value of the fee interest would vary from property to property. However, the application of the broad "value equivalence" test in a case-by-case manner would lead to undue uncertainty. In preparing legislation to implement Proposition 13 the Legislature concluded that both taxpayers and assessors need a specific test for the tax treatment of leases.[5] (Rep. of the Task Force on Property Tax Admin., presented to the Assem. Com. on Rev. & Tax. (1979) p. 41.) The term of 35 years was selected based upon the practice of financial institutions which will lend on the security of a lease of 35 years or longer. (*Ibid.* See Property Tax Assessment, prepared by the staff of the Assem. Rev. & Tax. Com. (1979) p. 25.) The Legislature intended that this would be a concrete example of the application of the basic definition of a change of ownership and was particularly concerned that this and the other statutory examples set forth in sections 61 and 62 be consistent with the general test. (Task Force Rep., *supra*, at p. 40.)

---

[5] As the task force explained it, "[t]he 'value equivalence' test is necessary to determine who is the primary owner of the property at any given time. Often two or more people have interests in a single parcel of real property. Leases are a good example. The landlord owns the reversion; the tenant, the leasehold interest. Suppose the landlord sells the property subject to the lease and the lessee assigns the lease. Which sale or transfer is the change in ownership? [¶] The example illustrates that in determining whether a change in ownership has occurred it is necessary to identify but *one* primary owner. Otherwise assessors would be forced to value, and account for separate base year values for landlords and tenants on all leases, and for other forms of split ownership. This would enormously complicate the assessor's job. [¶] A major purpose of this third element, therefore, is to avoid such unwarranted complexity by identifying the primary owner, so that only a transfer by him will be a change in ownership and when it occurs the *whole* property will be reappraised. If the hypothetical lease previously mentioned was a short term lease (the landlord owned the main economic value), the landlord's sale, subject to the lease would count. If, on the other hand, the lease was a long term lease (the lessee's interest was the main economic package), the lease assignment would count. In either case the entire fee value of the leased premises would be reappraised." (Rep. of the Task Force on Property Tax Admin., presented to the Assem. Com. on Rev. & Tax. (1979) pp. 39-40, italics in original.) The task force recommended the use of statutory examples to elaborate on common transactions. "Leases are a good illustration of the necessity of concrete statutory examples. Both taxpayers and assessors need a specific test—rather than the broad 'value equivalence' test—to determine the tax treatment of leases. The specific test[,] however, must be consistent with the 'value equivalence' rule and have a rational basis. Lenders will lend on the security of a lease for 35 years or longer. Thus 35 years was adopted as the concrete dividing line. If the term of a lease, including options to renew, is 35 years or more, the creation of the lease is a change in ownership and so is its expiration. If a lessee under such a lease assigns or sublets for a term of 35 years or more, that is another change in ownership. However, if the lease, including options, is for less than 35 years the lessor remains the owner and only the transfer of his interest is a change. In all cases, the entire premises subject to the lease in question are reappraised." (*Id.* at p. 41.).

When we consider the distinctions between mineral *profits à prendre* and estates for years in light of the purpose of section 61, subdivision (c), we conclude that the leasehold interests referred to in that subdivision are estates for years and not mineral *profits à prendre* regardless of whether the profits are nominally referred to as mineral leases or not. Section 61, subdivision (c) was intended to provide a concrete example of a change of ownership consistent with the general definition in section 60. The application of section 61, subdivision (c) to estates for years is consistent with section 60, and the determining period of 35 years has been judicially upheld against claims that it is arbitrary and unreasonable. (*E. Gottschalk & Co.* v. *County of Merced* (1987) 196 Cal.App.3d 1378, 1385-1386 [242 Cal.Rptr. 526].) But the application of section 61, subdivision (c) to mineral *profits à prendre* would not be consistent with section 60. A *profit à prendre* does not operate to transfer the beneficial use of the land; instead it creates a limited interest in the land, namely, the right to take something from the land, while all other beneficial uses are retained by the landowner. (*Gerhard* v. *Stephens, supra*, 68 Cal.2d at p. 878, fn. 7.) And the selection of a specific time limitation beyond which the "value equivalence" test of section 60 will be considered fulfilled may be reasonable where all beneficial uses are transferred but would be wholly arbitrary if applied to a *profit à prendre*.[6]

We also note that the contention urged by the County would produce an anomalous result. Before its amendment in 1985, section 61, subdivision (a) provided that a change of ownership includes the transfer of a perpetual mineral interest. Upon such an event the mineral interest was reassessed, but "[t]he balance of the property, other than the mineral rights, shall not be reappraised pursuant to this section." (Stats. 1979, ch. 242, § 4, pp. 507-508.) Section 61, subdivision (c) provides that the transfer of a leasehold of 35 years or longer is a change of ownership, but "[o]nly that portion of a property subject to such lease or transfer shall be considered to have undergone a change of ownership." In contemplation of law, a fixed-term mineral interest is less than a perpetual mineral interest and a *profit à prendre* is less than a conveyance of exclusive beneficial use of the property.

---

[6] The owner of a *profit à prendre* does not automatically have a right to possession of the surface but does have a right to such possession as may be necessary and convenient for exercise of the *profit*. (*Callahan* v. *Martin, supra*, 3 Cal.2d at p. 122.) Such a right may in fact preclude other surface uses. (*Ibid.*) But, depending upon the peculiar circumstances involved, such a right may permit substantial unrelated surface uses. (See *Donlan* v. *Weaver* (1981) 118 Cal.App.3d 675 [173 Cal.Rptr. 566]; *Wall* v. *Shell Oil Co.* (1962) 209 Cal.App.2d 504, 513-517 [25 Cal.Rptr. 908].) Thus, whether the transfer of a mineral interest of any term could meet the value equivalence test of section 60 would be fact dependent and not subject to concrete statutory limitations.

Nevertheless, according to the County, the conveyance of a fixed-term *profit à prendre* triggers reassessment of all interests in the subject property while a conveyance of a greater interest would not. Such a result is clearly contrary to the legislative intent expressed in sections 60 through 62.

In any event, while we reject the claim that section 61, subdivision (c) is applicable here, we further note that we would reject the County's view of the effect of that subdivision if we attempted to apply it to these circumstances. The result of a mineral *profit à prendre,* whether for a fixed term or in perpetuity, is to create two separate taxable estates. (*Bakersfield etc. Co.* v. *Kern County, supra*, 144 Cal. at p. 152; *Red Bluff Developers* v. *County of Tehama, supra*, 258 Cal.App.2d at p. 672.) If we were to conclude section 61, subdivision (c) is applicable because the mineral lease involved here is for a fixed term in excess of 35 years, we would nevertheless be compelled to adhere to the admonition of that subdivision that only the portion of the property subject to the lease may be considered to have undergone a change of ownership. In this case that is the mineral estate rather than all interests in the property. Alternatively, if we concluded that pursuant to subdivision (c) all transfers of an interest with a duration more than 35 years should be treated as perpetual or fee transfers, then we would be governed by subdivision (a) which also provides that when mineral interests are transferred in fee only the mineral interests are subject to reappraisal. In either case, only the mineral interests which are transferred are subject to reassessment to current value.

## II

While we reject the County's contention that the transfer of long-term but fixed mineral interests requires a reassessment of all interests in the property, we also reject Howard's contention that a transfer of fixed-term mineral rights is not a change of ownership within the meaning of Proposition 13. Howard's contention is based upon his view that section 61, subdivision (a) "is the *exclusive* provision applicable in determining changes of ownership of mineral leases . . . ." At the time this controversy arose subdivision (a) referred to perpetual mineral interests and fixed-term mineral interests were not expressly listed. However, while section 61 does not expressly list the transfer of a fixed-term mineral interest as an example of a change of ownership, it does expressly state that the examples listed are not exclusive. Under long-established precedent, a mineral lease, regardless of its duration, is a separate taxable estate in real property. ■ The transfer of such an interest is obviously a change of ownership of the mineral estate regardless whether such a transaction is expressly listed in section 61. The estate has been transferred and hence a "change in ownership" has occurred

within the meaning of the constitutional provision. (Cal. Const., art. XIII A, § 2, subds. (a), (d).)

With these principles in mind we may proceed to consider the specific transactions at issue here. The first dispute arises out of the 12th amendment to the original lease. The trial court found that the 12th amendment did not constitute a change of ownership of the mineral rights except for the lignite rights. The County contends that the 12th amendment constituted a change of ownership of all of the mineral rights. This is so, according to the County, because the original lease was terminated by the litigation in which the parties engaged, and because the 12th amendment was a novation.

We reject the claim that the mere commencement of litigation had the effect of terminating the original lease. In order to have the effect urged by the County, litigation must be taken to final judgment. (See 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, §§ 211, 216, pp. 648-649, 653-654.) The mere fact that the parties became embroiled in a dispute and commenced litigation against each other cannot be held to have had the effect of terminating their relationship or of extinguishing Interpace's existing *profit à prendre.*

We also reject the claim that the 12th amendment constituted a change of ownership of the mineral rights through novation. Novation is a contractual doctrine. In general the parties to a contract are free to determine for themselves their respective rights and liabilities so long as the purposes and effects of their agreement are lawful. (Civ. Code, § 1636.) The parties to an existing contract may, through mutual consent, modify or rescind their agreement. (Civ. Code, §§ 1689, subd. (a), 1697, 1698.) A novation is the substitution of a new obligation for an existing one. (Civ. Code, § 1530.) Essential to a novation is that it "clearly appear" that the parties intended to extinguish rather than merely modify the original agreement. (*Meadows* v. *Lee* (1985) 175 Cal.App.3d 475, 483-484 [221 Cal.Rptr. 22]; *Wade* v. *Diamond A Cattle Co.* (1975) 44 Cal.App.3d 453, 457 [118 Cal.Rptr. 695]; *Davies Machinery Co.* v. *Pine Mountain Club, Inc.* (1974) 39 Cal.App.3d 18, 24-25 [113 Cal.Rptr. 784].) The burden of proof is on the party asserting that a novation has been consummated. (*Davies Machinery Co.* v. *Pine Mountain Club, Inc., supra,* 39 Cal.App.3d at pp. 24-25.) In an unusual case such as this, where the parties to the contract deny that a novation occurred and a third party asserts that the original obligation was extinguished, then the burden is a heavy one and, absent fraud or collusion, a court would be warranted in finding in favor of the original parties to the

contract simply because they were the original parties. (*Meadows* v. *Lee, supra*, 175 Cal.App.3d at p. 484.)

The County's argument, distilled to its essence, is that the 12th amendment to the original lease substantially altered the contractual relationship of the parties and therefore must be considered a novation. However, that is not the test for a novation. Regardless of the extent to which a contract is modified, a novation cannot be found unless it be shown that the parties intended and agreed to extinguish the original contract. The 12th amendment not only fails to support the claim that the parties agreed to extinguish the original lease, it conclusively rebuts that claim. In the 12th amendment the parties expressly recognized and affirmed the continuing existence and validity of the original lease and, with one exception, the various amendments. The exception was the seventh amendment which granted Interpace the lignite rights. In the 12th amendment the parties expressly extinguished the 7th amendment and Interpace surrendered the lignite rights to Howard. But even in extinguishing the lignite rights the parties expressly recognized Interpace's continuing rights under the original lease and various amendments. We conclude that as a matter of law the 12th amendment cannot be construed as a novation.

In any event, application of the "change of ownership" aspect of Proposition 13 requires that we look at substance rather than form. (§§ 60-62.) A lease is both a conveyance of an estate in land and a contract between the parties. (*Parker* v. *Superior Court, supra*, 9 Cal.App.3d 397, 400.) The contract creates certain rights and obligations between the parties, such as the payment of rent or royalties. But the contractual rights, while valuable, are not part of the taxable estate in real property. (*Atlantic Oil Co.* v. *County of Los Angeles, supra*, 69 Cal.2d at p. 595.) With respect to a mineral *profit à prendre*, the taxable estate consists of the right to mine and extract minerals from real property. Unless there is a change of ownership of that right there can be no change of ownership within the meaning of Proposition 13. In this case Interpace remained in continuous possession of the mineral rights before and after the 12th amendment and thus there was no change in ownership of the mineral estate. Accordingly, we agree with the trial court that, except for the lignite rights, the 12th amendment did not constitute a change of ownership of Interpace's mineral estate.

With respect to the lignite rights we agree with the trial court that the 12th amendment did constitute a change of ownership. Howard's contention otherwise is based upon its view that section 61, subdivision (a) is the exclusive basis for finding a change of ownership of a mineral estate and the

fact that at the time of the 12th amendment that provision referred to perpetual mineral interests and not fixed-term mineral interests. We have already noted our disagreement with this claim. ■ The examples of a change of ownership listed in section 61 are not exclusive. Where a particular transaction is neither included in the list of examples of a change of ownership in section 61, nor excluded in the list of examples of transactions which are not changes of ownership in section 62, then reference must be had to general principles and the definition of a change of ownership in section 60. ■ The seventh amendment to the original lease granted Interpace a *profit à prendre* in lignite and thus created a taxable estate. In the 12th amendment the 7th amendment was terminated and Interpace released the lignite rights to Howard. Thus a change of ownership of the lignite rights took place ipso facto by virtue of the 12th amendment.

■ From this discussion it should be obvious that we agree with the trial court that the assignment by Interpace to NARCO of all of its rights under the lease was a change of ownership of those rights. No further discussion is necessary on this point.

■ We also reject the County's contention that the Owens-Illinois sand *profit à prendre* underwent a change of ownership by virtue of the 12th amendment or the Interpace-NARCO assignment. The County first bases this claim on its view that a change of ownership of the original mineral rights compels reassessment of all interests in the property. We have previously rejected this argument.

The County also asserts that since the Owens-Illinois *profit à prendre* was created in a sublease, a change of ownership of the primary lease compels the conclusion that the rights granted in the sublease have changed ownership regardless whether the sublessee's possession is disturbed. We reject the claim in these circumstances. The Owens-Illinois sublease was not simply an agreement between Owens-Illinois and Gladding McBean. In the second amendment to the original lease Howard and Gladding McBean agreed to grant Owens-Illinois continuity in ownership of its sand *profit à prendre* by agreeing that termination of Gladding McBean's lease would not terminate Owens-Illinois's rights. Owens-Illinois has been in continuous possession of its *profit à prendre* throughout all relevant periods despite any change in the relationships of Howard, Gladding McBean, Interpace, NARCO, and other parties. We perceive no change of ownership of the Owens-Illinois *profit à prendre*.

 The county finally contends that the trial court failed to apply the substantial evidence rule to the administrative board's factual findings.[7] (See *Cochran* v. *Board of Supervisors* (1978) 85 Cal.App.3d 75, 80 [149 Cal.Rptr. 304].) Pursuant to the substantial evidence rule a reviewing court must uphold an administrative board's factual findings if they are supported by substantial evidence. (*Ibid.*) However, conclusions of law are reviewed independently. (*Ibid.*)

 In its administrative decision the board found that the 12th amendment was a change of ownership and that the Owens-Illinois sublease went through a change of ownership. The trial court noted that the issues were submitted upon stipulated facts and held that the board's findings were in fact conclusions of law. The trial court was correct. The Legislature has recognized that the question whether property has undergone a change of ownership is a legal issue to be decided de novo by a superior court. (§ 1605.5.) This is consistent with existing precedents. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354]; *Board of Supervisors* v. *Archer* (1971) 18 Cal.App.3d 717, 724 [96 Cal.Rptr. 379].) In short, the determination of what happened is a factual question upon which the board's findings are entitled to substantial evidence deference, but the legal effect of those events, including whether they constitute a change of ownership, is a legal question upon which the trial court must exercise independent judgment.

Upon review of the record we find only one potential factual question here. That is whether the 12th amendment constituted a novation. Where there is conflicting evidence the question whether the parties to an agreement entered into a modification or a novation is a question of fact. (*Wade* v. *Diamond A Cattle Co., supra,* 44 Cal.App.3d at p. 457.) However where, as here, the issue turns upon the meaning of a written instrument and there is no conflicting extrinsic evidence, then the question is one of law upon which a reviewing court may exercise its independent judgment. (*Davies Machinery Co.* v. *Pine Mountain Club, Inc., supra,* 39 Cal.App.3d at pp. 23-24.) We conclude that the trial court was entitled to exercise independent judgment on the issues presented in this case and that it correctly resolved those issues.

---

[7] The administrative appeal was heard before the Amador County Board of Supervisors. The County asserts that the board was acting as a board of equalization and, in fact, the board purported to be sitting as a board of equalization. Howard states that the board was actually sitting as an assessment appeals board pursuant to section 1620. The question is irrelevant to the contention on appeal since the parties agree that the substantial evidence rule is the appropriate standard of review.

## DISPOSITION

The judgment is affirmed. Each party shall bear its own costs on appeal.

Evans, Acting P. J., and DeCristoforo, J., concurred.