**GRAND AVENUE PARTNERS, L.P., Plaintiff,**

v.

**Douglas GOODAN, et al., Defendants.**

**And Related Counterclaims.**

**No. CV 95–1425–GHK.**

United States District Court, C.D. California.

May 16, 1996.

---

James L. Goldman, Pircher, Nichols & Meeks, Los Angeles, CA, for plaintiff and counter-defendant Grand Avenue Partners, L.P.

Steven J. Dawson, Burke, Williams & Sorensen, Los Angeles, CA, for defendants/counterclaimants Douglas Goodan & Jean Barclay, Trustees of the E.W. Goodan Trust.

Paul J. Matzger, Leland, Parachini, Steinberg, Flinn, Matzger & Melnick, San Francisco, CA, for defendant Sumitomo Bank of California.

### AMENDED MEMORANDUM AND ORDER

KING, District Judge.

### I.

### INTRODUCTION

This is an action brought by plaintiff Grand Avenue Partners, L.P. ("GAP") against Douglas Goodan and Jean Barclay, Trustees of the E.W. Goodan Trust ("Trust"). Plaintiff seeks declaratory relief establishing that, *inter alia,* the monthly rental amount to be paid by GAP on the ground lease ("Lease") of the Checkers Hotel is $2,000.00, payable in United States currency, until December 31, 2025. GAP seeks preliminary and permanent injunctions preventing defendants from evicting GAP on the basis of rent calculated under the Lease's "gold clause."

Trust counterclaims against GAP and Sumitomo Bank of California ("Sumitomo") for, *inter alia,* a declaration that the gold clause required that rent be increased from $2,000.00 to approximately $41,817.00 per month on April 1, 1994 as a result of an alleged novation occurring when Sumitomo assigned its leasehold interest to GAP. The counterclaim also alleges that Sumitomo's transfer of the leasehold estate to GAP constituted a material breach of the Lease, giving rise to damages and termination of the Lease.

This matter is before the court on Sumitomo and GAP's joint motion for summary adjudication. (For convenience, we henceforth jointly refer to the counter-defendants as "Sumitomo.") Sumitomo seeks to establish that its transfer of the leasehold estate to GAP was not a novation constituting a "new obligation" within the meaning of 31 U.S.C. § 5118(d)(2) so as to re-activate the Lease's gold clause. Trust requests that its Opposition also be considered by the court as a cross-motion for summary adjudication. It is sensible to do so because the two motions concern a distinct legal issue with no factual disputes. *See Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 311–12 (9th Cir.1982).

### II.

### BACKGROUND

Trust is the owner and successor of original lessors E.W. and Nellie Goodan, who entered into a ninety-nine year lease with original lessee William Hart Anderson on

December 15, 1926. The Lease terminates on December 31, 2025. Rent was set at $1,000.00 monthly for the first year, $1,500.00 monthly for the next two years, and $2,000.00 per month for the remaining 96 years. Takaguchi Decl., Ex. A ("Lease") at 2.

As a control on inflation, the rental amount was subject to increase or decrease under a gold clause which defined all the dollar figures in the Lease in terms of the value of gold, and allowed for rent to be payable in U.S. currency "equivalent in market value" to the amount of gold that $2,000.00 in currency could buy at the time of the Lease formation. Lease at 3. The gold clause thus requires payment of the Lease obligations in gold dollars valued at the time the obligation was assumed. *See Adams v. Burlington Northern Railroad Co.*, 80 F.3d 1377, 96 Daily Journal D.A.R. 4135, 4135 (9th Cir. 1996). The Lease specified that a dollar at the time the Lease was created in 1926 equaled a gold coin of 25.8 grains of gold .900 fine. Under this standard, the $2,000.00 gold dollar rent amount allegedly would have approximated $41,817.00 in U.S. currency on February 17, 1995 (an example, because of the fluctuating price of gold). *See* First Amended Counterclaim ("FACC"), Ex. D.

However, in 1933, Congress invalidated gold clauses when it banned the private ownership of gold. *See* 48 Stat. 112, 113 (1933). In 1934, gold was abolished as legal tender in the United States, only to be reinstated as legal tender in 1985. *See Adams, supra*, at 4137, 80 F.3d 1377; *see also* 48 Stat. 337, 340 (1934); Gold Bullion Coin Act of 1985, Pub.L. No. 99–185, 99 Stat. 1177 (codified as amended at 31 U.S.C. § 5112 (1994)). The 1933 statute that, *inter alia*, invalidated gold clauses was amended on October 28, 1977 by a joint resolution of Congress that repealed the Depression-era ban on private gold ownership. *See Fay Corp. v. BAT Holdings I, Inc.*, 646 F.Supp. 946, 948 (W.D.Wash.1986);

*see also* 91 Stat. 1227, 1229 (1977). This resolution established that "[o]bligations payable in gold are discharged by payment in any United States legal tender, but that command does not apply to obligations issued after October 27, 1977." *Adams, supra*, at 4137, 80 F.3d 1377.

In 1982, the 1933 statute and its 1977 amendment were recodified in the following provision:

> An obligation issued containing a gold clause or governed by a gold clause is discharged on payment (dollar for dollar) in United States coin or currency that is legal tender at the time of payment. This paragraph does not apply to an obligation issued after October 27, 1977.

31 U.S.C. § 5118(d)(2).

Since then, two cases [1] have held that if a post October 27, 1977 assignment of a lessee's interest in a lease containing a gold clause constitutes a **novation** under state law, a new "obligation" arises within the meaning of 31 U.S.C. § 5118(d)(2), and the gold clause may be enforced to increase the rent. According to these cases, the nature of the leasehold transfer under state law determines whether the gold clause is re-activated pursuant to the federal statute.

On March 29, 1994, Sumitomo foreclosed on a deed of trust secured by the leasehold interest, thereby acquiring that interest from then-tenant Checkers Hotel Partners, L.P. Trust contends that the bank's assumption of the right to possession or actual possession of the premises, by virtue of foreclosing on the security interest, constituted a novation as a matter of law.

Sumitomo assigned its interest as lessee to GAP on April 1, 1994 in a document entitled Assignment of Ground Lease. FACC, Ex. C.[2] Thereafter, on February 23, 1995, Trust wrote to GAP demanding increased rent

---

1. *See Wells Fargo Bank v. Bank of America*, 32 Cal.App.4th 424, 429, 38 Cal.Rptr.2d 521 (1995) and *Fay Corp. v. BAT Holdings I, Inc.*, 646 F.Supp. 946, 948 (W.D.Wash.1986), *aff'd sub nom, Fay Corp. v. Frederick & Nelson Seattle, Inc.*, 896 F.2d 1227 (9th Cir.1990).

2. As a result of this litigation, GAP and Sumitomo rescinded—or attempted to rescind—the as-

signment on April 28, 1995, and instead entered into a sublease agreement. Because the parties do not address several outstanding issues, including the effectiveness of the rescission and whether Trust is estopped from increasing rent due to certain correspondence between it and defendants, we do not consider these issues at this time.

based on the theory that the transfer from Sumitomo to GAP constituted a novation that re-activated the gold clause.[3]

## III.

## DISCUSSION

The narrow issue in this case is whether an assignment under the provisions of the Lease constitutes a novation under state law.

### A. Terms of the Lease

The relevant sections of the Lease are as follows:

Section 1 of Art. XV states:

No assignment of the leasehold estate created hereby shall be made by the Lessee, and no such assignment shall be binding upon the Lessor unless such transfer shall be evidenced by an instrument in writing duly executed by the Lessee and the assignee with a certificate of acknowledgment of the execution in due form attached thereto, and which instrument shall be executed in duplicate and by its provisions bind the assignee to assume the obligations of the Lessee hereunder, and one of such executed instruments delivered unto the Lessor.

Lease at 33–34.

Section 3 of Art. XV states that after the leasehold is improved by a building,

... any assignment of the leasehold estate made in accordance with the provisions of Section 1 of this article shall release the assignor from all *direct liability* hereunder accruing after the making of such assignment and delivery of such instrument to the Lessor; provided, however, that nothing herein contained shall be construed to relieve any such assignor of liability hereunder while he remains in possession of the demised premises or any part thereof

or of his statutory or other liability as a stockholder of any corporate assignee.

Lease at 34 (emphasis added).

Finally, Section 5 of the article provides:

Every assignee and succeeding assignee shall be subject to the same terms and conditions as to future assignments as is the original lessee, and subsequent assignees shall in similar manner be relieved from *direct liability* hereunder accruing after the making of any assignment in accordance with the foregoing conditions and restriction.

Lease at 34–35 (emphasis added).

### B. Novation Under State Law

█ The parties agree that although a federal statute is involved (the statute providing for re-activation of gold clauses), the novation issue is a matter of state law. *Wells Fargo Bank, supra*, 32 Cal.App.4th at 432 n. 3, 38 Cal.Rptr.2d 521; *Fay Corp., supra*, 646 F.Supp. at 950. The question of whether a novation occurs when a lessee assigns its interest in the leasehold estate to a third party is a legal issue to be decided by the court. *See River Bank America v. Diller*, 38 Cal.App.4th 1400, 1413 n. 9, 45 Cal.Rptr.2d 790, 796 (1995) (where no extrinsic evidence was offered as aid in interpreting waiver provisions of guaranty agreements, the court resolved the issue as a question of law).

"Novation is the substitution of a new obligation for an existing one." Cal.Civ.Code § 1530.[4] Pursuant to Cal.Civ.Code § 1531, a novation can occur by one of three methods:

1. By the substitution of a new obligation between the same parties, with intent to extinguish the old obligation;

2. By the substitution of a new debtor in place of the old one, with intent to release the latter; or,

3. By the substitution of a new creditor in place of the old one, with intent to

---

3. Trust indeed contends that each post October 27, 1977 assignment of the lease constituted a "new obligation" pursuant to 31 U.S.C. § 5118(d)(2) so as to re-activate the gold clause. Because we find that the terms of the lease control our analysis in this case, our conclusion necessarily applies to each post–1977 assignment.

4. A novation "is made by contract, and is subject to all the rules concerning contracts in general." Cal.Civ.Code § 1532.

transfer the rights of the latter to the former.

■ For a novation to occur by the second method, there must be a complete release of the original debtor. *See Engineering Service Corp. v. Longridge Inv. Co.,* 153 Cal.App.2d 404, 414, 314 P.2d 563 (1957); *Wells Fargo Bank,* 32 Cal.App.4th at 431, 38 Cal.Rptr.2d 521 (novation is new contract that supplants preceding agreement and "completely extinguishes" original obligation). An essential requirement of novation is that "it 'clearly appear' that the parties intended to extinguish rather than merely modify the original agreement." *Howard v. County of Amador,* 220 Cal. App.3d 962, 977, 269 Cal.Rptr. 807 (1990) (citing *Meadows v. Lee,* 175 Cal.App.3d 475, 483–84, 221 Cal.Rptr. 22 (1985)).

## C. Application of Law of Novation to the Terms of the Lease

■ Trust's counterclaim, as well as its position on these motions, hinges on the proposition that Article XV of the Lease (pages 33–35) permits "complete and automatic release of the lessee upon assignment," thereby automatically effecting a novation upon assignment. It contends that a new obligation arose in 1994, reactivating the gold clause in the Lease. In support of its novation argument, Trust relies on *Wells Fargo Bank*[5] and *Fay.*[6] In these cases, novations occurred, resulting in new obligations issued

after October 27, 1977. Thus, the gold clauses in those leases were enforceable to increase rent pursuant to 31 U.S.C. § 5118(d)(2) and the terms of the contracts.

Sumitomo distinguishes the two cases by pointing out that the underlying lease agreements in those cases provided for the release of *all* of the lessee's contractual liability to lessor, as opposed to the mere release of "direct" liability as established by the terms of the Lease in the instant case.

Section 3 of Art. XV of the Lease states that an assignment meeting other requirements in Section 1 operates to release the assignor from all "direct" liability under the Lease. *See supra,* at 5–6. Sumitomo argues that because direct liability is tantamount to liability as primary obligor, the Lease does not release the assignor/lessee of contractual liability as a surety.[7] Accordingly, assignments permitted by the Lease do *not* constitute novations. We agree.

Caselaw was ambiguous in 1926 as to the legal effect of an assignment upon the assignor/lessee's liability to the lessor. Some cases contemporaneous with the Lease formation suggest that an assignor/lessee becomes liable to the lessor as a surety rather than as a primary obligor. *See Brosnan v. Kramer,* 135 Cal. 36, 39–40, 66 P. 979 (1901); *Schehr v. Berkey,* 166 Cal. 157, 160, 135 P. 41 (1913); *Samuels v. Ottinger,* 169 Cal. 209, 211–212,

---

**5.** In *Wells Fargo Bank,* the court noted that the lease "expressly provided that the lessee 'shall be relieved of all liability accruing under this lease from and after the date of any assignment....'" 32 Cal.App.4th at 432, 38 Cal.Rptr.2d 521. The court determined that the terms of the underlying lease and of the agreement between assignor and assignee created a novation because complete liability was transferred from assignor/lessee to the assignee and mutual assent existed among all three parties:

> [T]he 1981 transaction transferring the lease to the bank was a novation. The bank's purchase of the lease from Triangle completely extinguished Triangle's obligations to plaintiffs, leaving plaintiffs to look only to the bank for performance of the lease.

*Id.* The court grounded its legal conclusion on the language of the 1929 lease and also cited the terms of the 1981 document transferring the leasehold estate from Triangle to the bank.

**6.** In *Fay,* the 1929 lease provided:

> [I]n the event that any assignment shall be made at the times, under the conditions, and in the manner herein before set forth, the party so selling, assigning or conveying the leasehold estate hereby created shall thereby be forever released and discharged from any and all obligations arising or accruing under the covenants and agreements of this lease contained subsequent to the date of such sale, conveyance, or assignment....

*Id.* at 949, n. 5. The parties did not contest the effect of this language to completely extinguish the assignor's liability to the lessor. *Id.* at 951. Instead, the novation dispute centered on "whether the necessary 'mutual agreement among all parties' existed[ed] to complete a novation." *Id.*

**7.** "A surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor." Cal.Civ.Code § 2787.

146 P. 638 (1915). However, in *Lopizich v. Salter*, 45 Cal.App. 446, 449, 187 P. 1075 (1920), an appellate court stated that the express assumption by the assignee of obligations under the Lease did not affect the liability of the assignor/lessee to the lessor. Moreover, despite its statements about suretyship, *Samuels* can be, and has been,[8] read to suggest that the assignor/lessee remained a primary obligor. *See Samuels* at 212, 146 P. 638.

The surety relationship is distinguishable from "direct" liability in that a surety, as opposed to a primary obligor, could avail itself of certain common law and statutory suretyship defenses prior to having to answer for the debt of the "principal" obligor— in this case, the assignee. California Civil Code § 2845 (entitled "Requiring creditor to pursue certain remedies; exoneration of surety by creditor's neglect to proceed"), as it read in 1926, likewise provided a suretyship defense:

> A surety may require his creditor to proceed against the principal, or to pursue any other remedy in his power which the surety can not himself pursue, and which would lighten his burden; and if in such case the creditor neglects to do so, the surety is exonerated to the extent to which he is thereby prejudiced.

(As enacted in 1872, *see* 1939 Stat. 453 § 30, text unchanged in 1939 amendment.)

Because some authorities in 1926 support the proposition that an assignor becomes a surety upon assignment, the use of the word "direct" in § 3, Article XV of the Lease ensured continued liability of the assignor, albeit only as a surety.[9] Because the Lease does not completely extinguish the assignor/lessee's obligation to lessor, a novation

does not arise as a matter of law upon assignment. *See Wells Fargo Bank*, 32 Cal. App.4th at 431, 38 Cal.Rptr.2d 521; *Howard*, 220 Cal.App.3d at 977, 269 Cal.Rptr. 807.

The Trust argues there is no distinction between contractual liability as surety and as primary obligor inasmuch as both are "direct." For this point, Trust mainly relies on *T.A.D. Jones Co. v. Winchester Repeating Arms Co.*, 55 F.2d 944, 946 (D.Conn.1932) ("As a surety, [assignor/lessee] was directly liable for the rent to the original lessor...").[10] Of course, this 1932 decision post-dated the 1926 Lease and did not involve California law.

Moreover, Trust's argument proves too much. To the extent it claims that any claim assertable against a party creates "direct" liability, then indeed there can be no such "indirect" liability. If there is no distinction between "direct" and "indirect" liability, it would have been superfluous for the Lease to use the word "direct" to modify the word "liability" in Sections 3 and 5 of Article XV. It would be an unreasonable interpretation of the Lease for us to conclude that use of the word "direct" was meaningless.

Trust also attempts to argue that, in 1926, the law was clear that the legal effect of this type of assignment was to render the assigning lessee still liable to the lessor as primary obligor. As such, the release of the assignor/lessee from direct liability purportedly released the assignor/lessee from any and all contractual liability. In light of the conflict and uncertainty in the law cited *supra*, we reject Trust's position.

Trust also claims that if the law in 1926 operated to render an assignor/lessee liable to the lessor as a surety, it would have been superfluous for the contracting parties to

---

8. *See De Hart v. Allen*, 26 Cal.2d 829, 832, 161 P.2d 453, 455 (1945).

9. Long after the time of the lease formation, the legal effect of an assignment by a assignor/lessee was definitively set out in *De Hart v. Allen, supra*. The California Supreme Court in 1945 stated that the assignment of a lease, even with the lessor's consent, ordinarily does not release the assignor from liability as primary obligor of the lessor: "as between the lessor and lessee, the latter remains a primary obligor under his express contract to pay rent."

10. Of the cases relied on by Trust in this regard, only *T.A.D. Jones Co.* purported to specifically characterize surety liability as "direct" liability. *Samuels'* discussion is at best vague, while *Meredith v. Dardarian*, 83 Cal.App.3d 248, 147 Cal. Rptr. 761 (1978), decided long after the formation of the Lease, demonstrates there is a meaningful distinction between surety and primary obligor liability.

relieve the lessee of "direct" liability as primary obligor in Section 3, Art. XV since it would already have been relieved of such liability by operation of law. Thus, argues Trust, the word "direct" would in effect be "read out of the Lease" if the court accepted Sumitomo's construction of "direct liability" to mean liability as a primary obligor.

We disagree. First, Trust hypothecates a position Sumitomo never asserted; rather, Sumitomo maintains that the relevant California law in 1926 was ambiguous and in conflict. Furthermore, if the law in 1926 did operate to transform an assignor/lessee into a surety upon assignment, that would not diminish Sumitomo's ultimate proposition that the Trust, by the terms of the Lease, never released the assignor/lessee from surety liability. Indeed, given the placement of the word "all" directly preceding it, the use of the word "direct" in Section 3—even if the assignor were already absolved of liability as a primary obligor by operation of law—would have been essential to differentiate and preserve surety liability. Rather than eliminate the need for the word "direct," Trust's argument highlights the need for the use of that word in order to ensure that surety liability was *not* released upon assignment. If, in fact, the Trust had intended to release the assignor/lessee of both primary and surety liability, it could have done so quite simply by not using the word "direct" between the words "all" and "liability." That it chose not to do so is of significance against this backdrop of the state of the law at that time. Indeed, it would be unreasonable for us to redact the word "direct" from the Lease merely because unforeseen intervening events suggest that such redaction would enure to the Trust's benefit.

We are also not persuaded by Trust's alternative argument that the "direct" liability language of Section 3 was necessary to ensure that the assigning tenant is released from all subsequent contractual liability only, but not from liability arising from privity of estate or statute. Such distinction is unnecessary to maintain the assignor/lessee's liability based on privity of estate "while he remains in possession of the demised premises" because such property law-based liabil-ity already attached at common law by virtue of continued possession. *See* Lease, Art. XV, Section 3; *see also Samuels v. Ottinger,* 169 Cal. 209, 211, 146 P. 638 (1915) ("An obligation to pay rent, without an express agreement to that end, arises *from the mere occupancy,* as tenant, of the premises.") (emphasis added).

Nor would deletion of the word "direct" jeopardize lessor's ability to hold the assignor/lessee liable under privity of estate claims because the release language only covers "all [direct] liability **hereunder.**" *See* Clause 1, Section 3, Article XV. Under no circumstances would the release reach non-contract based liability even in the absence of the word "direct," particularly in the presence of the word "hereunder." *Id.*

Finally, Trust's interpretation of "direct liability" as meaning contractual liability *in contrast* to liability arising from privity of estate is also unsatisfactory in its failure to account for the fact that the reserved liability of the assignor/lessee "while he remains in possession of the demised premises or any part thereof" is liability *under the Lease.* It is therefore contractual in nature, rather than based on privity of estate.

*See* Section 3, Article XV:

> [Clause 1]
> . . . any assignment of the leasehold estate made in accordance with the provisions of Section 1 of this article shall release the assignor from all direct liability hereunder accruing after the making of such assignment and delivery of such instrument to the Lessor;
> [Clause 2]
> provided, however, that nothing herein contained shall be construed to relieve any such assignor of liability *hereunder* while he remains in possession of the demised premises or any part thereof or of his statutory or other liability as a stockholder of any corporate assignee.

Lease, Art. XV, Section 3, Clause 2 (emphasis added). Thus, Trust's argument that "all direct liability" means "all contractual liability" is significantly undermined by the contracting parties' inclusion of the word "hereunder" in the second clause.

Given the state of the law in 1926, we conclude that, because the language of the Lease specifies that "direct" liability terminates upon assignment, the Lease is most reasonably construed as establishing that while the assignor/lessee's contractual liability to the lessor as primary obligor is terminated, its contractual liability as a surety did *not* terminate. Unlike the contracting parties in *Fay* and *Wells Fargo Bank*, the contracting parties in this case did not, by the use of the "direct liability" language, seek to totally release the assignor/lessee from all contractual liability upon assignment. Based on this language of the underlying Lease, any subsequent assignments pursuant to the terms of the Lease did not effect a novation.[11]

## Conclusion

For all of the above reasons, Sumitomo's motion for summary adjudication is therefore **GRANTED** and the Trust's cross-motion for summary adjudication is **DENIED**.

## Certification

The court has conferred with counsel and with the concurrence of counsel determines that this order is appropriate for interlocutory appeal to the Court of Appeals pursuant to 28 U.S.C. § 1292(b). The court believes that the novation issue decided above involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of this litigation. Accordingly, all dates currently on the court's calendar are vacated and this action is stayed pending further action by the Ninth Circuit Court of Appeals.

IT IS SO ORDERED.

---

11. Nor can we agree with Trust's fallback argument that release of Sumitomo's contractual liability as a *primary* obligor created a novation pursuant to Cal.Civ.Code § 1531(1). *See supra* at pp. 1067–1068. The test is not, as Trust proposes, whether the relationship of the parties to the ground lease changed. *See* Motion at 24. If this were the law, all assignments would be novations. Rather, for a novation to have occurred according to subsection (1), Sumitomo's previous contractual obligations under the lease must have been completely extinguished and then replaced with a new obligation "between the same parties". *See* Cal.Civ.Code § 1531(1). However, the lease assignment pursuant to Section 3 added GAP, a new party, thus taking the situation out of the scope of § 1531(1).

Moreover, the key language of Art. XV, Section 3 ("shall release the assignor from all direct liability hereunder") does not, as explained above, "extinguish" all of Sumitomo's contractual liability to Trust. Rather, that language serves to more narrowly circumscribe the assignor/lessee's existing contractual liability to the lessor. Thus the assignor/lessee's contractual liability to the lessor to pay the rent (the "obligation") was never extinguished by Section 3 because the assignor remained contractually liable for the rent in its role as surety.