[No. H024871. Sixth Dist. July 29, 2003.]

SAN JOSE PARKING, INC., Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
CITY OF SAN JOSE REDEVELOPMENT AGENCY, Real Party in
Interest.

1322

**COUNSEL**

Matteoni Saxe & O'Laughlin, Norman E. Matteoni, Peggy O'Laughlin and Gerald Houlihan for Petitioner.

McDonough, Holland & Allen and T. Brent Hawkins for Respondent.

Richard Doyle, City Attorney, George Rios, Assistant City Attorney, C. Donald McBride and Robert Fabela, Deputy City Attorneys, for Real Party in Interest.

**OPINION**

**RUSHING, P.J.**—In its petition for a writ of mandate, San Jose Parking, Inc. (SJP) asks us to direct the trial court to vacate its order finding that Redevelopment Agency of San Jose (Agency) has the right to condemn SJP's

interest in the Fountain Alley parking lot. Because we conclude that SJP does not have a real property interest in the Fountain Alley parking lot, we will grant the request for writ relief.

## FACTS AND PROCEDURAL BACKGROUND

Agency owns real property in downtown San Jose, commonly known as the Fountain Alley parking lot.

In 1997, SJP and Agency entered into an agreement relating to Fountain Alley. The agreement was titled the "Exclusive Negotiations and Operating Agreement" (Agreement).

Under the first part of the Agreement, SJP was granted an exclusive right to negotiate a disposition and development agreement for Fountain Alley for a 10-year period, *unless terminated earlier as provided under the Agreement.* In exchange, SJP was required to pay $25,000 per month for the first five years. Paragraph 1.1 of the Agreement states, in pertinent part: "It is expressly understood and agreed by the parties that this is a contract regarding development negotiations only and does not convey any interest in Property or a potential DDA [disposition and development agreement] or constitute any approval whatsoever of any proposed project."

Under the second part of the Agreement, SJP was given the right to manage and operate the parking lot as a surface off-street parking facility and retain all revenues from the parking lot, subject to certain terms and conditions. Paragraph 2.1 provides, in pertinent part: "This Agreement does not grant to SJP any real property interest in the Property, including, without limitation, any leasehold interest."

In June 2000, the Urban Land Institute, which was commissioned by Agency to study the redevelopment of the downtown San Jose area, issued its report. The report identified Fountain Alley as a key parcel in the redevelopment efforts, and included a recommendation to "[r]einvent Fountain Alley as a gathering place and civic focus, using the new mixed-use project to integrate housing, retail space …, and parking."

In January 2001, Agency entered into an Exclusive Negotiation Agreement with a developer, Palladium, for the proposed mixed-use project.

In February 2001, after discovering Agency was negotiating with another developer, SJP filed suit against Agency. The lawsuit sought a restraining order to stop Agency from negotiating with other developers for Fountain Alley's development and asked that Agency be ordered to negotiate with SJP for that development.

A few days later, Agency served notice on SJP of its decision to appraise SJP's interest in Fountain Alley.

On April 2, 2002, the Agency Board of Directors adopted Resolution of Necessity No. 5265 authorizing the condemnation of the Fountain Alley parcel.

On April 4, 2002, Agency filed a complaint in eminent domain against SJP. Agency sought a judgment condemning SJP's interest in the downtown parking lot as established by the Agreement. According to Agency, SJP's interest was a real property interest for which a taking was authorized under state eminent domain law. Agency alleged that it had approved a resolution of necessity for acquisition of SJP's interest, and Agency's appraiser had established a fair market value for the interest of $3.747 million, which had been offered to SJP.

SJP answered the complaint in eminent domain, objected to Agency's right to take, and alleged an abuse of discretion and failure to comply with the California Environmental Quality Act (CEQA).

On April 17, 2002, the trial court determined that it appeared that Agency had the right to acquire the rights described in Agency's eminent domain complaint and found that Agency had deposited $3.691 million with the county clerk. The trial court therefore entered a 90-day order of possession prior to judgment.

SJP invoked Code of Civil Procedure section 1260.110, subdivision (a) and challenged Agency's right to take. SJP and Agency stipulated that the issue should be heard before the issue of compensation was determined.

On June 24, 2002, trial commenced on the limited issue of the right to take. On July 17, 2002, the trial court issued a tentative decision. According to the decision, the Agreement granted to SJP an interest in real property subject to Agency's power of eminent domain. The trial court sustained SJP's objection under Code of Civil Procedure section 1250.360, subdivision (h) and found that Agency failed to comply with CEQA requirements. Relying upon considerations of equity, the trial court declined, however, to dismiss the complaint in eminent domain.

SJP petitioned for a writ of mandate. Among other things, SJP asked that the trial court be directed to vacate its order finding that Agency had the right to take SJP's interest in the Fountain Alley lot. We issued an order to show cause, informed Agency of its right to file a return in opposition to the writ, informed SJP of its right to reply to the return, and stayed the trial court proceedings pending our review and further order.

## DISCUSSION

As we explain, the Agreement does not create in SJP any interest or estate in real property and therefore SJP's rights under the Agreement are not within Agency's powers of condemnation.

Agency's power to condemn is described under Health and Safety Code section 33391.[1] It provides: "Within the survey area or for purposes of redevelopment an agency may: [¶] (a) Purchase, lease, obtain option upon, acquire by gift, grant, bequest, devise, or otherwise, any real or personal property, any interest in property, and any improvements on it, including repurchase of developed property previously owned by the agency. [¶] (b) Acquire *real property* by eminent domain." (Italics added.)

Section 33390 defines real property. It states: " 'Real property' means: [¶] (a) Land, including land under water and waterfront property. (b) Buildings, structures, fixtures, and improvements on the land. [¶] (c) Any property appurtenant to or used in connection with the land. [¶] (d) Every estate, interest, privilege, easement, franchise, and right in land, including rights-of-way, terms for years, and liens, charges, or encumbrances by way of judgment, mortgage, or otherwise and the indebtedness secured by such liens."

Code of Civil Procedure section 1240.110 does not expand Agency's eminent domain powers.[2] Under Code of Civil Procedure section 1240.110, subdivision (b): "Where a statute authorizes the acquisition by eminent domain only of specified interests in or types of property, this section *does not expand* the scope of the authority so granted." (Italics added.) The Law

---

[1] All further unspecified statutory references are to the Health and Safety Code.

[2] Code of Civil Procedure section 1240.110 provides: "(a) Except to the extent limited by statute, any person authorized to acquire property for a particular use by eminent domain may exercise the power of eminent domain to acquire any interest in property necessary for that use including, but not limited to, submerged lands, rights of any nature in water, subsurface rights, airspace rights, flowage or flooding easements, aircraft noise or operation easements, right of temporary occupancy, public utility facilities and franchises, and franchises to collect tolls on a bridge or highway. [¶] (b) Where a statute authorizes the acquisition by eminent domain only of specified interests in or types of property, this section does not expand the scope of the authority so granted."

Review Commission Comment to section 1240.110 confirms that section 1240.110 does not broaden the grant of eminent domain power within 33390. According to the comment, "if the statutory grant to the particular entity is specifically limited to 'real property,' Section 1240.110 does not extend that grant to include personal property."[3] (Cal. Law. Revision Com. com., 19 West's Ann. Code Civ. Proc. (1982 ed.), foll. § 1240.110, p. 506.)

Although Agency agrees that its eminent domain powers are limited to real property under section 33390, Agency says the Agreement falls within section 33391's definition of real property because the Agreement grants to SJP an "estate, interest, privilege, easement, franchise, and right in land."

To support its argument, Agency suggests the Agreement was similar to an option to purchase. Under Agency's view, an option to purchase grants to the optionee an "estate, interest, privilege, easement, franchise, and right in land" thereby justifying Agency's action to condemn SJP's rights under the Agreement.

■ Agency's view is contradicted by a long line of cases stating that an option contract relating to the sale of land conveys *no* interest in the land. (See *Leslie v. Federal Finance Co., Inc.* (1939) 14 Cal.2d 73, 80 [92 P.2d 906] [option is merely an offer to sell and vests no estate in the property to be sold]; *Warner Brothers Pictures v. Brodel* (1948) 31 Cal.2d 766, 772 [192 P.2d 949] [same]; *Palo Alto Town and Country Village, Inc. v. BBTC Company* (1974) 11 Cal.3d 494, 503 [113 Cal.Rptr. 705, 521 P.2d 1097] [same]; *Rollins v. Stokes* (1981) 123 Cal.App.3d 701, 708–709 [176 Cal.Rptr. 835] [same]; *Helvering v. San Joaquin Co.* (1936) 297 U.S. 496, 498 [80 L.Ed. 824, 56 S.Ct. 569] [same]; *Richardson v. Hardwick* (1882) 106 U.S. 252, 254 [27 L.Ed. 145, 1 S.Ct. 213] ["[t]he [option] contract, of itself, did not vest him with any interest or estate in the lands"].)

*County of San Diego v. Miller* (1974) 13 Cal.3d 684 [119 Cal.Rptr. 491, 532 P.2d 139], cited by Agency, is not to the contrary. *Miller* holds only that "the owner of an unexercised option to purchase land possesses a property right which—if taken by government—is compensable ...." (*Id.* at p. 693.) Importantly, *Miller* recognized that under traditional property principles, an

---

[3] With respect to subdivision (b), the comment states: "Subdivision (b) of Section 1240.110 recognizes that, if the interest in property authorized to be taken is limited by the statutory grant (as, for example, where the statute authorizes acquisition of only an easement), an attempt to take an interest in the property other than that permitted by the statute is precluded. Also, if the statutory grant to the particular entity is specifically limited to 'real property,' Section 1240.110 does not extend that grant to include personal property. On the other hand, if the statutory grant of condemnation authority is to acquire any 'property' necessary for a particular use, Section 1240.110 makes clear that this includes authority to condemn both real and personal property of any type." (Cal Law Revision Com. com., reprinted at 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1240.110, p. 506.)

option does *not* create in the optionee an estate in land. *Miller* observed: "We do not dispute the technical correctness of the … conclusion that—applying traditional common law concepts of property—the option creates in the optionee no estate as such in land. [Citation.]" (*Id.* at p. 691.)

It is important to emphasize that when *Miller* decided that the owner of the unexercised option possessed a compensable property right, *Miller's* focus was on the issue of *compensation*, rather than the right to exercise the power of eminent domain in the first instance. *Miller* reasoned that the "property-contract labeling process is not necessarily determinative in questions of due process compensation. Instead compensation issues should be decided on considerations of fairness and public policy." (*County of San Diego v. Miller, supra,* 13 Cal.3d at p. 691.) Also, in *Miller,* it was never claimed that the county only had the power to condemn real property.

Unlike *Miller,* our focus is not upon the issue of compensation, and the concomitant concerns of fairness and public policy. Nor are we confronted with a statute granting a government entity the broad power to condemn any "property." Instead, we face a statute that expressly limits Agency's condemnation power to the power to condemn real property and must determine whether Agency's attempt to condemn SJP's rights under the Agreement falls within that power.

Relying upon *Southern Cal. Edison Co. v. Bourgerie* (1973) 9 Cal.3d 169 [107 Cal.Rptr. 76, 507 P.2d 964] (*Bourgerie*), Agency contends the Agreement includes a building restriction and maintains that the building restriction creates in SJP an interest in real property. We disagree.

As in *Miller,* the question in *Bourgerie* was whether the taking of the building restriction was compensable; *Bourgerie* did not address the scope of the entity's eminent domain power. Moreover, *Bourgerie* did not involve a statute restricting the governmental entities' eminent domain power to the power to condemn real property. The *Bourgerie* court only considered whether the building restriction constituted compensable "property." (See also *Committee to Save the Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn.* (2001) 92 Cal.App.4th 1247, 1271 [112 Cal.Rptr.2d 732] [rejecting claim that *Bourgerie* established that a building restriction is an interest in real property].)

Having concluded that any building restriction and option to purchase within the Agreement do not establish in SJP an interest or estate in land within the meaning of section 33391, we next consider whether the Agreement can be characterized as a lease.

The Agreement explicitly states that it does not grant to SJP "any leasehold interest." For us to conclude that the Agreement is a lease would contradict

the Agreement's express terms and render meaningless the parties' clear expression of intent that the Agreement not be characterized as a lease.

Besides expressly stating that it does not create a leasehold interest, the Agreement lacks several fundamental attributes of a lease. For example, the Agreement does not embody " '[t]he distinguishing characteristics of a leasehold estate ... that the lease gives the lessee the exclusive possession of the premises against all the world, including the owner [citation], ... [Citation.]' [Citation.]" (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 32 [31 Cal.Rptr.2d 378], quoting *Howard v. County of Amador* (1990) 220 Cal.App.3d 962, 972 [269 Cal.Rptr. 807].) Specifically, under section 2.11 of the Agreement, SJP must provide reasonable access for pedestrian customers of the adjacent property owners. Section 2.8 requires SJP to maintain the preexisting monthly parking spaces at the lot and limits the rate SJP can charge these patrons. Under section 2.11, Agency expressly "retain[s] access rights on, over and through the Parking Lot from the adjacent parking lot" for use by itself and the City of San Jose. Agency also reserves the "right to grant access rights, including vehicular access, over and across the Property" to one adjacent property at no cost to either Agency or the grantee. Finally, under section 2.6, SJP is required to accept, without reimbursement, validation stamps from any validation program established by the City of San Jose.

Agency's claim of exclusivity is also undercut by section 2.2 of the Agreement, which gives Agency the right to set the maximum parking rate. (See *Golden West Baseball Co. v. City of Anaheim, supra,* 25 Cal.App.4th at p. 33.) Further, under section 2.12(A)–(E), Agency dictates the appearance, demeanor, minimum wages and management requirements of SJP employees.

Not only does the Agreement not give SJP exclusive possession, but it also lacks another fundamental attribute of a lease—the payment of rent. Section 1.3(A) of the Agreement demonstrates that the money paid was not rent since it says that the monthly payments were made "In consideration for obtaining the exclusive right to negotiate with the Agency for the development of the Property." Thus, the money paid was for the acquisition of development rights rather than for use of the parking lot. Since the payment was not for the use of the premises, it cannot be considered the legal equivalent of rent. (See *Santa Monica Rent Control Bd. v. Bluvshtein* (1991) 230 Cal.App.3d 308, 317 [281 Cal.Rptr. 298].) That the monthly payments cannot be characterized as rent is also supported by section 1.4(D). Under section 1.4(D), if SJP and Agency fail to reach a development agreement by the commencement date, the $1.5 million that had been paid to Agency ($25,000 per month for 5 years), plus one half the accrued interest, will be *reimbursed* to SJP. This provision for reimbursement of the monthly $25,000 paid by SJP shows

that the money paid was not rent—a lease does not result in the return of the rent to the lessee at the conclusion of the lease.

For these reasons, we conclude that the Agreement cannot be characterized as a lease.

Agency cites tax cases, such as *City of San Jose v. Carlson* (1997) 57 Cal.App.4th 1348 [67 Cal.Rptr.2d 719], to argue that the Agreement creates an "estate, interest, privilege, easement, franchise, and right in land." But *City of San Jose* held only that "these [interests] were correctly found to be taxable possessory interests within the meaning of Revenue and Taxation Code section 107." (*Id.* at p. 1351.) Our result cannot be based upon cases finding "possessory interests" for tax purposes. We are not considering a tax issue and are not faced with the task of defining the term " 'possessory interests.' " (*Placer County Water Agency v. Jonas* (1969) 275 Cal.App.2d 691, 698 [80 Cal.Rptr. 252] ["concept of ' "possessory interests" ' for taxation purposes is entirely different from that of compensable interests in eminent domain"]; accord, *Golden West Baseball Co. v. City of Anaheim, supra*, 25 Cal.App.4th at pp. 34–35.)

Under Agency's view, the Agreement is an interest or estate in real property because it has attributes of a license. ■ Even if we were to conclude that the Agreement contains attributes of a license, case law makes clear that licenses create *no* interest in real property. (See *Placer County Water Agency v. Jonas, supra,* 275 Cal.App.2d at pp. 695–697; *People ex rel Dept. Pub. Wks. v. Lundy* (1965) 238 Cal.App.2d 354, 358 [47 Cal.Rptr. 694]; *Wilmington Liquid Bulk Terminals v. Somerset Marine* (1997) 53 Cal.App.4th 186, 197–198 [61 Cal.Rptr.2d 727]; 6 Miller & Starr, Cal. Real Estate (3d ed. 2000) Easements, § 15.2, p. 8 [licensee "has a personal privilege but does not possess either an interest in land or any estate in the property"]; see also *Hubbard v. Brown* (1990) 50 Cal.3d 189, 196 [266 Cal.Rptr. 491, 785 P.2d 1183] ["California eminent domain law, like federal law, declares licenses to be noncompensable in eminent domain proceedings"]; *Belmont County Water Dist. v. State of California* (1976) 65 Cal.App.3d 13, 17 [135 Cal.Rptr. 163] [same].)

According to Agency, even though the Agreement may not be able to be pigeonholed into any one category of interest in real property, it grants to SJP broad features of many interests in real property and thereby satisfies the requirements of section 33390.[4]

---

[4] We reject as meaningless parsing Agency's claim that while the Agreement may not have "granted" or "conveyed" any interest or right in real property to SJP, it nonetheless "created" the type of interest, right or privilege subject to Agency's eminent domain powers. If no real property interest was "granted" or "conveyed" to SJP, then SJP possesses no real property

We disagree with this approach. The words of section 33390 are clear. To apply them as Agency suggests would improperly broaden section 33390's scope. The Agreement either grants to SJP an interest or estate in real property as that term is defined under section 33390, or it does not. Permitting Agency to pick and choose between attributes of different interests or estates in real property and argue that a mishmash of this sort satisfies section 33390 could ultimately make meaningless the restriction limiting Agency's eminent domain power to real property.

A strict construction of section 33390's definition of real property is supported by the fact that other statutes grant other entities a broader eminent domain power—the power to condemn property—while section 33391 is expressly limited to real property. (See, e.g., Gov. Code, §§ 37350.5 [city may acquire by eminent domain "any property"], 25350.5 [county may acquire by eminent domain "any property"]; Pub. Util. Code, § 21652, subd. (a)(1) ["any property" may be condemned]; Water Code, § 8593 [Reclamation Board may acquire by eminent domain "any property"].) Since the Legislature has chosen to limit Agency's eminent domain power to the power to condemn real property while granting other entities the power to condemn property, whether real or personal, we think a strict interpretation of the meaning of real property is warranted. Otherwise the limitation imposed by the Legislature under section 33391 would be seriously weakened and the distinction between the power to condemn real property as opposed to property would be blurred, thereby thwarting the clear expression of Legislative intent embodied by the Legislature's use of the words "real property" within section 33391.

Our view is also bolstered by section 33391, subdivision (a). Section 33391, subdivision (a) states that Agency may "Purchase, lease, obtain option upon, acquire by gift, grant, bequest, devise, or otherwise, *any real or personal property, any interest in property*, and any improvements on it, including repurchase of developed property previously owned by the agency." (Italics added.) The contrast between the broad types of property Agency is authorized to acquire under subdivision (a), and the language of subdivision (b), is telling. Although the Legislature has chosen to permit Agency to acquire by various means both personal and real property and any interest in such property, it has decided that Agency may only acquire by eminent domain one type of property—real property.

The express language of the Agreement also undermines Agency's argument. This intention was made clear in not one but two separate parts of the

interest, and if SJP possess no real property interest, then there is nothing for Agency to take by way of eminent domain.

Agreement. Under section 1.1, it is provided: "It is expressly understood and agreed by the parties that this is a contract regarding development negotiations only and does not convey any interest in Property or a potential DDA [disposition and development agreement] ...." Section 2.1 provides: "This Agreement does not grant to SJP any real property interest in the Property, including, without limitation, any leasehold interest." With this clear and straightforward statement of the intention of the parties, we decline to interpret the Agreement as advocated by Agency.

Amicus Curiae California Redevelopment Association asserts that the language stating that the Agreement does not convey any interest in real property is merely standard language. They claim it is only included to ensure Agency is not required to follow various procedures, such as public hearings and CEQA compliance, necessary when a redevelopment agency disposes of an interest in land. (See §§ 33431, 33433; Pub. Res. Code, § 21000 et seq.) Thus, according to the California Redevelopment Association, the Agreement language merely exists to "make it clear that, by approving the Agreement, [Agency] was *not disposing of an interest in land* ...." (Italics added.)

The Redevelopment Association's argument supports our conclusion that the Agreement does not convey or grant to SJP any interest or estate in real property. Because the Agreement gave SJP no interest or estate in real property, when Agency entered into the Agreement with SJP, Agency did not dispose of any interest in land and therefore Agency was not required to comply with the various procedures identified by the California Redevelopment Association.

In this case, Agency and SJP chose to state within the Agreement that no interest in real property was being conveyed. ▮ Following established rules of contract interpretation, the parties' mutual intent at the time of the contract formation governs its interpretation. (Civ. Code, § 1636.) Under Civil Code section 1638, "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." It has been stated that "parties to a contract have a right to exclude what they wish from the ambit of any term that they use in their agreement." (*Hawkins v. York* (1969) 2 Cal.App.3d 98, 106 [82 Cal.Rptr. 434] [agreement expressly excluded leases as an encumbrance and the intent of the parties on this issue should be given effect].)

 For all these reasons, we conclude the Agreement did not grant to SJP any interest or right in real property under section 33390 and therefore Agency does not have the power to acquire by eminent domain SJP's rights under the Agreement.[5]

## DISPOSITION

Let a peremptory writ of mandate issue directing the trial court to vacate its order finding that the Agreement creates an interest in real property that is condemnable by Agency. San Jose Parking, Inc. is entitled to its costs on appeal.

Bamattre-Manoukian, J., and Mihara, J., concurred

A petition for a rehearing was denied August 28, 2003, and the opinion was modified to read as printed above. The petition of real party in interest for review by the Supreme Court was denied Novemeber 12, 2003.

---

[5] Because of our conclusion, and as SJP recognizes, we need not pass on SJP's other request for writ relief—that the trial court be directed to vacate its order and issue a conditional dismissal of the eminent domain action that requires Agency to rescind its defective resolution of necessity and adopt a new, valid resolution of necessity.