EDMUND G. BROWN JR. Attorney General MARC J. NOLAN Deputy Attorney General
THE HONORABLE STEVE COOLEY, DISTRICT ATTORNEY FOR THE COUNTY OF LOS ANGELES, has requested an opinion on the following questions:
1. May a redevelopment agency and its negotiator discuss the terms of a proposed rehabilitation loan agreement in closed session where the agreement pertains to the use of real property that the agency is currently subleasing to the proposed recipient of the rehabilitation loan, makes reference to the existing sublease, and incorporates certain of its terms — but does not effectuate the acquisition, disposal, or modification of any real property rights under the existing sublease?
2. May a redevelopment agency and its negotiator discuss the terms of a proposed rehabilitation loan agreement in closed session based on the circumstance that the agreement includes the agency's acquisition of restrictive covenants, including use and operating covenants, over real property occupied by the proposed recipient of the rehabilitation loan? *Page 2 
 CONCLUSIONS
1. The circumstance that a proposed rehabilitation loan agreement pertains to the use of real property that a redevelopment agency is currently subleasing to the proposed recipient of the rehabilitation loan, makes reference to the sublease, and incorporates certain of its terms — but does not effectuate the acquisition, disposal, or modification of any real property rights under the existing sublease — does not, in itself, permit the agency and its negotiator to discuss the terms of the proposed agreement in closed session.
2. The circumstance that a proposed rehabilitation loan agreement includes a redevelopment agency's acquisition of restrictive covenants, including use and operating covenants, over real property occupied by the proposed recipient of the rehabilitation loan does not, in itself, permit the agency and its negotiator to discuss the terms of the proposed agreement in closed session.
 ANALYSIS
Here, we consider whether the provisions of the Ralph M. Brown Act[1]
— which generally provide that local legislative bodies must hold open public meetings when conducting "the people's business"[2] — permit a local redevelopment agency to discuss, in closed session, the terms of a proposed agreement to provide a rehabilitation loan to a private business entity. The question stems from a disagreement over whether certain details of an actual loan transaction were properly discussed out of public view. Many local governing bodies take the position that this and similar types of closed-session discussions are permissible, under the Brown Act's "real property exception,"[3] where (as here) the proposed agreement pertains to the use of real property that the agency is leasing to the proposed loan recipient, or where the agreement would grant the agency restrictive covenants over the loan recipient's operation of a business on the subject real property. On the other hand, a number of prosecuting agencies contend that the Brown Act's real property exception is not broad enough to encompass the discussions that occurred in the present case. We agree with this latter view.
We begin our analysis with a review of the circumstances that prompted this opinion request. A city's redevelopment agency (Agency) leased a parcel of commercial real property from the property's owner and, in turn, subleased it to a retail business *Page 3 
(Business) that operated a motorcycle and watercraft sales dealership at the location.[4] Both the lease and the sublease took effect at the same time and were for the same term of years. The sublease provided, among other things, that the premises were to be used as the Business's sole sales and leasing facility for most of the product lines that it carried. Under the sublease, the Business also agreed to spend a certain amount of money on improvements to the property, with that amount to include funds that the Agency would extend to the Business via an anticipated rehabilitation loan, meaning that the obligation to make the improvements under the sublease remained the same regardless of the loan amount.
Several years after the sublease took effect, the Agency proposed to enter into a rehabilitation loan agreement (RLA) with the Business. Under the RLA as originally proposed, the Agency would loan the Business a certain sum of money, and make certain additional payments to the Business, which the Business would use to renovate the interior of the existing commercial building and construct additional floor space that would accommodate an expected increase in business and taxable sales. If the Business complied with its obligations under the proposed RLA, then the Agency loan would, in essence, be forgiven through the use of annual credits that the Agency would grant to the Business against the loan balance. In other words, Agency funds loaned to the Business for the stated purposes would have to be repaid only if the Business ceased operation or otherwise committed a material breach of the proposed RLA. The improvements to be made on the subject property would be governed by the terms of the existing sublease, the existing master lease, and additional terms of the RLA.
The proposed RLA also contained a business operation covenant, under which the Business would agree, as it had under the terms of the sublease, to continue to operate its principal place of business within city boundaries and to report all its sales receipts as sales made within the city. In addition, the proposed RLA — whose term length the parties understood would extend beyond that of the existing sublease — would require the Business to extend the term of its occupancy of the premises by entering into a new direct lease with the property owner after the sublease expired.[5] The proposed RLA specified that additional use and operating restrictions would take effect upon expiration of the *Page 4 
sublease.[6]
At one of the Agency's meetings, it recessed into closed session with its real estate negotiator to discuss proposed changes to the RLA. Changes to the RLA were approved by the Agency in open session later that same night, but did not ultimately appear in the final version of the RLA that was adopted and took effect some months later.[7] After the meeting, a citizen complained that this discussion should not have been held during closed session. After learning of and investigating the complaint, prosecutors from the local district attorney's office concluded that the closed-session discussion amounted to a Brown Act violation. The Agency, however, asserted that the closed session was authorized because the topics covered fell under the Brown Act's real estate negotiations exception. We were then asked to provide a formal legal opinion on the issue.
In enacting the Brown Act, the Legislature declared its intent as follows:
 [T]he Legislature finds and declares that the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly.
 The people of this State do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created.[8]
The Brown Act thus implements and furthers the command[9] found in Article I, section 3(b)(1) of the state Constitution, which provides: *Page 5 
 The people have the right of access to information concerning the conduct of the people's business, and therefore, the meetings of public bodies and the writings of public officials and agencies shall be open to public scrutiny.
As the Supreme Court has observed, the Brown Act was "adopted to ensure the public's right to attend the meetings of public agencies."[10] To effectuate this purpose, the Brown Act "requires that the legislative bodies of local agencies . . . hold their meetings open to the public except as expressly authorized by the Act."[11] And, although the Brown Act contains express statutory exceptions that authorize closed sessions to be held with regard to certain matters, [12] these exceptions are construed narrowly, while the Brown Act's general command "in favor of openness in conducting public business" is construed liberally.[13] This is so because statutory language "must be construed in the context of the statutory framework as a whole, keeping in mind the policies and purposes of the statute, and where possible the language should be read so as to conform to the spirit of the enactment."[14] These rules of interpretation also implement and further the state constitution's directive that a statute or other legal authority "shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access."[15]
The Brown Act exception that concerns us here is often called the "real property exception," and it provides in part as follows:
 Notwithstanding any other provision of this chapter, a legislative body of a local agency may hold a closed session with its negotiator prior to the purchase, sale, exchange, or lease of real property by or for the local agency to grant authority to its negotiator regarding the price and terms of *Page 6 payment for the purchase, sale, exchange, or lease. [¶¶.]
 For purposes of this section, "lease" includes renewal or renegotiation of a lease. [¶¶.][16]
An oft-cited comment explaining the rationale for this provision states:
 The need for executive [closed] sessions in this circumstance is obvious. No purchase would ever be made for less than the maximum amount the public body would pay if the public (including the seller) could attend the session at which that maximum was set, and the same is true for minimum sale prices and lease terms and the like.[17]
Obvious though the need for it may be, this is still a narrowly crafted exception. It does not authorize closed-session discussions of any and all transactions concerning real property. Rather, the provision authorizes a local body to hold a closed session with its negotiator "prior to" the purchase or other transfer of real property, and then only "to the extent that the local agency wishe[s] to grant authority to its negotiator regarding the price and terms of payment for the purchase/transaction."[18] This provision, which "appears to grant [the local agency] a rather narrow scope of authority . . . to determine what discussions are germane to the particular transaction in real property,"[19] presents a "narrowly defined exception to the rule of open meetings."[20]
 1. Effect of preexisting sublease
The first question we address is whether a redevelopment agency and its negotiator may discuss a proposed rehabilitation loan agreement in closed session where, as here, the agreement pertains to the use of real property that the agency is subleasing to the proposed recipient of the rehabilitation loan, makes reference to the sublease, and incorporates certain of its terms — but does not effectuate the acquisition, disposal, or modification of any real property rights under the existing sublease. *Page 7 
In the present circumstances, the real property in question had already been leased by the Agency, which then subleased it to the Business, several years before the proposed RLA came up for discussion. Had the Agency been in the process of negotiating a new sublease with the Business or renegotiating or renewing the then-existing sublease, then a closed-session discussion with its negotiator to grant him or her authority regarding the "price" or "terms of payment" for the lease (or sublease) would have fallen within the express statutory language and fulfilled the essential negotiation purposes articulated above. In other words, we do not dispute that a sublease — whether newly-formed, renewed, or renegotiated — is a "lease" that could be the proper subject of a closed-session discussion between a local legislative body and its negotiator within the meaning of this exception.
But the proposed RLA itself did not represent any sort of leasing or subleasing arrangement between the Agency and the Business, nor did it purport to be a renewal or renegotiation of the preexisting sublease between the two parties. In fact, the RLA made no modifications or changes to the underlying sublease, and it does not appear that any such modifications or changes were ever envisioned. Because the RLA had no effect on the underlying sublease, it follows that the closed-session discussion of its terms could not possibly have served the purpose articulated in the real estate exception, i.e., to inform or develop a negotiating strategy regarding the price and/or terms of payment for the purchase, sale, exchange, or lease of real property.
The Agency and those local authorities who have submitted comments on this question view the situation quite differently. They assert, among other things, that the Agency's negotiation of a potential rehabilitation loan to the Business is so interrelated with the underlying sublease that the two transactions should not be viewed separately, but as components of the Agency's overall strategy regarding the subject property. It is also argued that the loan would bring about such a change in the condition of the subleased property that it could well be seen as affecting the "terms of payment" for that property. Indeed, the loan appears to have been made for the purpose of facilitating the Business's ability to perform its obligations, under both the RLA and the sublease, to make improvements to the property. Under these circumstances, it is argued, developing a negotiating strategy for a rehabilitation loan transaction involving Agency-leased property should be considered the type of activity for which the Brown Act's real property exception permits a closed-session discussion.
From a business perspective, we understand and appreciate the desire to develop a negotiating strategy vis-à-vis the proposed loan transaction in private, with a view to getting the most favorable terms possible on a public agency's offer to loan money. We observe, however, that the Agency's preference for closed-session strategizing on a loan agreement would be the same even if the Business were operating on its own (or *Page 8 
privately leased) property and the Agency were not a party to the lease on the property — a circumstance which would clearly have taken all of the discussions out of the scope of the real property exception.[21] Thus the key question is whether the existence or nature of the underlying sublease was enough to justify a closed session. We conclude that it was not.
First, because the lease was not being negotiated or renegotiated at the time the closed-session discussion took place, that discussion did not occur "prior to the purchase, sale, exchange, or lease"[22] of real property (or a renewal or renegotiation of an existing lease), as expressly required by the exception.[23] In our view, the sequencing of events would be enough in itself to render the real estate exception inapplicable, but the exception's other requirements were not met either. The fact that the Agency happened to be subleasing the property to the Business at the time it considered granting the Business a rehabilitation loan did not transmute a discussion on the terms of the proposed RLA — which was a financial transaction whereby the Agency would loan the Business public funds in anticipation of improving the Business's sales, and thus generating greater sales tax revenue — into one that had anything to do with negotiating either the price or terms of payment for the sublease. Again, the terms of the sublease did not change, and had no potential to change, as a result of the negotiation of the rehabilitation loan. Instead, the closed-session discussion was conducted for purposes of discussing the terms of an interim draft of the RLA itself, not so that the Agency could "grant authority to its negotiator regarding the price and terms of payment" for any "purchase, sale, exchange, or lease" of real property.[24]
Furthermore, the fact that the RLA under consideration referred to the then-existing sublease and incorporated certain of its terms (such as an operating covenant for the Business) is not, in our view, enough to bring it within the real property exception. Simply put, the RLA was not a "purchase, sale, exchange, or lease" in its own right. The *Page 9 
distinguishing characteristics of a lease are that it "`gives the lessee exclusive possession of the premises'"[25] in exchange for the payment of rent.[26] The RLA was not a contract for lease of the property. Rather, the RLA presupposed that a lease existed, thus giving the Business the right to operate on the premises. Initially, this was accomplished via the Business's preexisting sublease with the Agency, and later under its direct lease with the property owner. In our view, the very fact that the lease changed hands during the life of the RLA demonstrates that the RLA was both legally and functionally distinct from the underlying leasing arrangement.
To put it another way, the Business's obligations and duties under the sublease remained the same, despite any duties and obligations it undertook under the RLA. But while the Business's material breach of the sublease (or later direct lease), such as a failure to pay the prescribed rent, could affect its right to occupy the property, its breach of the RLA would not. As mentioned above, the Business's breach of the RLA would require the repayment of a loan which, in essence, would have otherwise been forgiven. And since the RLA had no effect on any terms of the underlying sublease, it could not have affected the particular subset of terms — i.e., the "price and terms of payment for the . . . lease" — that the real estate exception permits to be discussed in closed session. For example, the present loan transaction, which occurred several yearsafter rather than "prior to" the sublease transaction, could not affect the already agreed-upon consideration given to acquire the property rights conferred under the sublease.
We recognize, of course, that the RLA did affect the parties to the underlying sublease as well as the real property subject to it, in the sense that the RLA was an agreement between those same two parties and involved the use of the same property. Indeed, the proposed loan was evidently intended to facilitate the Business's ability to perform its agreement, under the sublease as well as under the RLA, to improve the subject property. But the RLA did not purport to replace, modify, or have any other effect on the sublease itself. So, even granting that the RLA affected the relationship between the Agency and the Business, the condition of the property, and/or either party's ability to perform its obligations under the sublease, the RLA did not impact the "price" or "terms of payment" set forth in the sublease. A discussion of the RLA's various potential terms and features, therefore, falls outside the express language of the real *Page 10 
property exception as set forth in Government Code section 54956.8.[27]
Because the state constitution and the Brown Act itself require us to interpret its exceptions to public access narrowly, we must conclude that the requirements of the real estate exception are not satisfied in this example.
At its core, the transaction embodied in the RLA was a loan of public money to a private business. Under the circumstances, we find nothing in the Brown Act that would countenance holding a discussion of this topic, which would appear to be very much a matter of public concern, in closed session.[28] Accordingly, in response to the first question, we conclude as follows: The circumstance that a proposed rehabilitation loan agreement pertains to the use of real property that a redevelopment agency is subleasing to the proposed loan recipient, makes reference to the sublease, and incorporates certain of its terms — but does not effectuate the acquisition, disposal, or modification of any property rights under the existing sublease — does not, in itself, permit the agency and its negotiator to discuss the terms of the proposed agreement in closed session.
2. Effect of restrictive covenants
The second question is whether a redevelopment agency and its negotiator may properly discuss the terms of a proposed rehabilitation loan agreement in closed session *Page 11 
based solely on the circumstance that the agreement includes the agency's acquisition of restrictive covenants over the property that is the subject of the rehabilitation loan. The Agency and other local authorities that have shared their views with us suggest that — especially since the actions of a local redevelopment agency are at issue here — the term "real property" as used in the Brown Act's real property exception should be read as encompassing the relatively broad definition of real property that is set forth in the Community Redevelopment Law.[29] That definition states that "real property" means:
 (a) Land, including land under water and waterfront property.
 (b) Buildings, structures, fixtures, and improvements on the land.
 (c) Any property appurtenant to or used in connection with the land.
 (d) Every estate, interest, privilege, easement, franchise, and right in land, including rights-of-way, terms for years, and liens, charges, or encumbrances by way of judgment, mortgage, or otherwise and the indebtedness secured by such liens. [30]
Using this definition of real property, it is argued that the Agency's closed-session discussion was permissible because the Agency was negotiating to acquire use and operating covenants, and such covenants are generally recognized as compensable "interests" or "rights" in real property.
We do not agree that the definition of "real property" set forth in the Community Redevelopment Law should control the application of the Brown Act. In our opinion, the Brown Act's exception for negotiations concerning "real property" is most reasonably read as incorporating the general definition of real property as embodied in both the common law[31] and the Civil Code, [32] to include land and its permanent or immovable features. We do not believe it is either necessary or helpful to consult the definition of "real property" contained in the Community Redevelopment Law (or any other subject matter-specific statute), especially when doing so would run counter to our obligation to narrowly construe exceptions to the Brown Act's open meeting requirements.[33] *Page 12 
In any event, even indulging the view that the Brown Act's real estate exception should apply in the context of the purchase, sale, exchange, or lease of an interest or right in real property within the meaning of the Community Redevelopment Law, our conclusion would not differ. The proposed RLA, including its use and operating covenants, was not a means to transact such a purchase, sale, exchange, or lease.[34]
The operating and use restrictions set forth in the RLA did not give the Agency any right in or to the subject real property. True, the Agency would have a right to enforce these restrictions under the RLA, [35]
but the remedy for the Business's breach of these restrictions would not involve any right involving the property itself.[36] Rather, the RLA provided that if the Business did not comply with the use and operating covenants, then the Business may be required to reimburse the Agency for the loan of public funds that the Agency had advanced. But such a breach of the RLA would have no effect on the Business's legal right to possession of the premises — either under the sublease with the Agency that had previously been in effect or under the new direct leasing arrangement it has with the property owner.[37] *Page 13 
We recognize that the RLA was closely interrelated with the sublease, in that both involved the Business's use of the same real property, and both contained covenants regulating the Business's operations on that property.[38] But the mere fact that one topic (such as a redevelopment loan involving a certain property) is related to another topic that may properly be discussed in closed session (such as the price or terms of payment on the sale or lease of the same property) is not a valid basis for discussing the merely-related topic in closed session.[39] Nor does the fact that a transaction or series of transactions is complex justify a departure from the plain and narrow meaning of the Brown Act's real property exception.[40] To conclude otherwise would "turn the Brown Act on its head, by narrowly construing the open meeting requirement and broadly construing the statutory exceptions to it."[41] *Page 14 
Under the Brown Act in its current form, the RLA was like any other contract involving significant financial interests. In the absence of an applicable Brown Act exception, contracts must be considered in open session. We understand the policy argument in favor of permitting local agencies to strategize with their negotiators in closed session, with regard to loan agreements and other types of contracts, for the purpose of pursuing the best possible deal for the constituents that the agencies represent. But as salutary as such purposes may be, our role is only to interpret the law as it is written, not to stretch it to fit particular policy goals. The Legislature, of course, is always free to broaden the real property exception, or create new negotiations exceptions to the Brown Act's overarching command for open meetings, but it has not done so yet.
Thus, in response to the second question, we conclude as follows: The circumstance that a proposed rehabilitation loan agreement includes a redevelopment agency's acquisition of restrictive covenants, including use and operating covenants, over real property occupied by the proposed recipient of the rehabilitation loan does not, in itself, permit the agency and its negotiator to discuss the terms of that proposed agreement in closed session.
[1] Govt. Code §§ 54950-54963.
[2] See Govt. Code § 54950.
[3] Govt. Code § 54956.8.
[4] It appears that the same individual was a principal in both the corporation that owned the subject property and leased it to the Agency, and in the retail business that subleased the property from the Agency. This circumstance, however, is not critical to our analysis.
[5] We understand that the sublease in effect at the time of the loan transaction has now expired, and that the Business and property owner have, in fact, entered into a direct lease arrangement.
[6] For example, we are informed that, under the sublease, the Business was allowed to operate another dealership in another city for sales of certain brands of motorcycles. However, under the terms of the proposed RLA, the alternate dealership location would no longer be permitted after the sublease expired.
[7] This, we are told, was a result of the parties' further negotiations and the Business's substantially reduced estimate of the scope of the proposed building improvements and the necessary rehabilitation costs.
[8] Govt. Code § 54950.
[9] Cal. Const. art I, § 26 ("The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise.")
[10] Freedom Newsp. Inc. v. Orange Co. Employees Ret. Sys.,6 Cal. 4th 821, 825 (1993).
[11] Kleitman v. Super. Ct., 74 Cal. App. 4th 324, 331 (1999); see
Govt. Code §§ 54953, 54962; Roberts v. City of Palmdale, 5 Cal. 4th 363, 374
(1993)
[12] Hamilton v. Town of Los Gatos, 213 Cal. App. 3d 1050, 1055
(1989); Govt. Code, 54957.
[13] Shapiro v. San Diego City Council, 96 Cal. App. 4th 904, 917
(2002); Bell v. Vista Sch. Dist., 82 Cal. App. 4th 672, 682 (2000).
[14] Rudd v. Cal. Cas. Gen. Ins. Co., 219 Cal. App. 3d 948, 952
(1990) (internal citations omitted).
[15] Cal. Const. art. I, § 3(b)(2).
[16] Govt. Code § 54956.8 (emphasis added).
[17] Schwing, Open Meeting Laws § 7.76, 416-418 (1994); see alsoKleitman v. Super. Ct., 74 Cal. App. 4th at 324.
[18] Shapiro v. San Diego City Council, 96 Cal. App. 4th at 922.
[19] Id.
[20] Id. at 924.
[21] As the parties to the rehabilitation loan transaction understood, the Business did in fact start to lease the subject property directly from the property owner after the sublease expired.
[22] Govt. Code § 54956.8 (emphasis added).
[23] The fact that the earlier sublease mentioned an anticipated rehabilitation loan — to make clear that the Business's agreement to make a minimum dollar amount of property improvements under the sublease included any funds extended via such a loan — does not bring the years-later discussion of the actual RLA back in time such that it should be viewed as having occurred "prior to" the sublease transaction.
[24] Id.
[25] Golden West Baseball Co. v. City of Anaheim, 25 Cal. App. 4th 11,32 (1994), quoting Howard v. Co. of Amador, 220 Cal. App. 3d 962, 972
(1990).
[26] See Santa Monica Rent Control Bd. v. Bluvshtein,230 Cal. App. 3d 308, 317 (1991); see also San Jose Parking, Inc. v.Super Ct., 110 Cal. App. 4th 1321, 1328 (2003).
[27] It might be argued that our view puts form over substance because a local agency could avoid the strictures of the Brown Act simply by inserting a provision into a proposed rehabilitation loan agreement stating that the agreement modifies a lease or by proposing to change the property's rental rate by some trivial amount. But superficial maneuvers of that sort would not insulate an agency from an inquiry into whether the substance of any closed-session discussion in fact satisfied the terms of the real property exception. The critical question would remain whether such a discussion was held "prior to the purchase, sale, exchange, or lease of real property by or for the local agency to grant authority to its negotiator regarding the price and terms of payment for the purchase, sale, exchange, or lease." If the discussion were held at another time or for another purpose, holding it in closed session would still violate the Brown Act.
[28] As mentioned, the RLA provided that the loan the Agency extended to the Business would essentially be forgiven if the Business satisfied its obligations under the RLA (presumably to the ultimate benefit of the Agency and its constituents). So it might be more accurate to describe the RLA as representing an investment of public money in a private business. That characterization of the transaction, however, does not render it any less appropriate for public scrutiny.
[29] Health Saf. Code §§ 33300 et seq.
[30] Health Saf. Code § 33390 (emphasis added).
[31] See Escondido Union School Dist. v. Casa Suenos De Oro, Inc.,129 Cal. App. 4th 944, 965 (2005).
[32] Civ. Code § 658.
[33] Moreover, if the "real property" definition contained in the Community Redevelopment Law were found to be inconsistent with the term "real property" in the Brown Act, the Brown Act would control. Government Code section 54958 states that the Brown Act's provisions "shall apply to the legislative body of every local agency notwithstanding the conflicting provisions of any other state law."
[34] Indeed, it has been specifically held that a restrictive covenant against building on a parcel of property does not amount to an interest or right in real property for purposes of the Community Redevelopment Law, but rather is a contractual right to the performance of, or adherence to, a duty, which may be compensated by money damages if the duty is breached. San Jose Parking, Inc. v. Super. Ct.,110 Cal App. 4th at 1327; see also Comm. to Save Beverly HighlandsHomes Assn. v. Beverly Highlands Homes Assn., 92 Cal. App. 4th 1247,1271 (2001). While such covenants do not constitute an interest in the real property to which they are attached, they are nonetheless considered valuable and compensable "property" under the law of eminent domain. SeeSouthern Cal. Edison Co. v. Bourgerie, 9 Cal. 3d 169, 172 (1973).
[35] See e.g. Nahrstedt v. Lakeside Village Condominium Assn.,8 Cal. 4th 361, 379, 389 (1994).
[36] See Comm. to Save Beverly Highlands Homes Assn. v. BeverlyHighlands Homes Assn., 92 Cal. App. 4th at 1271.
[37] For similar reasons, we reject the Agency's alternative argument that the RLA somehow conveyed an interest in real property on the ground that it gave the Agency a lien, encumbrance, or mortgage against the premises upon which the Business was operating. This circumstance, it is suggested, would cause the RLA transaction to be one involving "real property" as that term is defined in the Community Redevelopment Law. Health Saf. Code § 33390(d). Again, the idea is that, if the transaction qualified as one involving "real estate" under that body of law, then the discussion of its terms would fall under the Brown Act's real property negotiations exception.
The RLA, however, did not encumber the real property upon which the Business operated. Rather, under the RLA, the Agency would forgive its loan of public monies to the Business if the Business satisfied the RLA's terms. Conversely, if the Business breached the terms of the RLA, then it would be obligated to repay the sums advanced. But in no event did the RLA confer upon the Agency some right against the real property itself in the event the Business breached its terms. The fact that the Business's breach of a particular use or operating covenant may also have constituted a material breach of the separate sublease agreement (i.e., because the same or similar covenant was contained in the sublease) does not transform the RLA into a transaction involving an interest in real property under the Community Redevelopment Law — much less into one involving the sale, purchase, exchange, or lease of real property within the meaning of the Brown Act's real property exception.
[38] Different facts would, of course, require a different analysis, and in some cases might bring about a different result. If, for example, a particular loan agreement were to be negotiated simultaneously with a lease, and if the authority for negotiations on the loan agreement were to include parameters for the price or terms of payment for the lease, such circumstances could affect the ultimate conclusion. A catalog of such variables and where each one might lead, however, goes beyond the scope of this opinion.
[39] See Trancas Property Owners Assn. v. City of Malibu,138 Cal. App. 4th 172, 186-187 (2006).
[40] Shapiro v. San Diego City Council, 96 Cal. App. 4th at 924.
[41] Id. *Page 1